2000 UT 92

**J.R. SIMPLOT COMPANY, dba Simplot Soilbuilders, Plaintiff and Appellee,**

v.

**SALES KING INTERNATIONAL, INC., Bountiful Valley Produce, Inc., and Virgil Anderson, Defendants and Appellant.**

No. 990223.

Supreme Court of Utah.

Dec. 5, 2000.

David C. Nye, Kent L. Hawkins, Pocatello, ID, for J.R. Simplot Co.

John A. Adams, Kevin Glade, Salt Lake City, for Sales King International, Inc.

RUSSON, Associate Chief Justice:

¶ 1 Sales King International, Inc. ("Sales King"), appeals the district court's grant of summary judgment to J.R. Simplot Company dba Simplot Soilbuilders ("Simplot"). We affirm.

## BACKGROUND

¶ 2 Bountiful Valley Produce, Inc. ("BVP"), produced onion and squash crops on farms near Tremonton, which is within Box Elder County, Utah. Simplot sold chemicals and fertilizer on credit to BVP for the 1993, 1994, 1995, and 1996 growing seasons. To secure its interests, Simplot maintained annual security agreements with BVP and also filed a Uniform Commercial Code ("UCC") Financing Statement [1] with the Utah Department of Commerce, Division of Corporations and

---

1. This financing statement is also referred to as a UCC–1 form or a CFS–1 form.

Commercial Code, Central Filing System in May 1993. Simplot's financing statement specified that Simplot retained a security interest in BVP's Box Elder County onion crops and all proceeds from such crops. A legal description of BVP's property was included, but no particular crop year was specified on the financing statement.

¶ 3 For the years 1993 and 1994, Simplot was completely repaid for the chemicals and fertilizer it had sold to BVP on credit. However, Simplot claims it received no payment for the $200,000 in chemicals and fertilizer sold to BVP for the 1995 growing season, nor for the $23,676.30 in chemicals and fertilizer sold to BVP for the 1996 growing season.

¶ 4 In 1994, Sales King and BVP entered into a marketing agreement that made Sales King a marketing agent for BVP. Sales King served as a marketing agent for the 1994, 1995, and 1996 growing seasons, and as an agent, Sales King sold BVP's crops but never actually took ownership of them. The terms of their agreement allowed Sales King to collect the proceeds from the crop sales and retain amounts from those proceeds to cover sales commissions and various expenses. Also, though not specified in the marketing agreement, Sales King directly paid some of BVP's creditors. In an attempt to protect its interests, Sales King filed a financing statement with the Box Elder County recorder[2] in April 1995 claiming a security interest in all BVP's crops and in the proceeds from the sale of those crops, as specified in the marketing agreement between BVP and Sales King.

¶ 5 In early 1995, a representative from Sales King ("Sales King Rep") allegedly had a telephone conversation with the Simplot credit manager for BVP's account. During that conversation, the Sales King Rep purportedly discussed Sales King's final payment to Simplot for BVP's 1994 credit purchases from Simplot. The Sales King Rep allegedly asked Simplot's credit manager for a letter indicating that Simplot had been paid in full and would "be releasing the UCC's" so that the Sales King Rep could then release

the balance of the money to BVP. The Sales King Rep claimed that she eventually received a letter that satisfied her so that she was able to release the 1994 monies to BVP.

¶ 6 The Sales King Rep also claimed that in 1995, according to standard office procedure, she sent a letter to the Sales King corporate attorneys requesting that they research whether there were any UCC security interests filed against BVP. The Sales King Rep further claimed that her job required her only to initiate the request. She did not expect, nor did she receive, any sort of response or acknowledgment and therefore had no indication of what action was taken on her request for a UCC check on BVP.

¶ 7 The sales proceeds from BVP's 1995 onion crop totaled $192,856.86. From this amount, Sales King retained $20,250.17 in sales commissions and $18,159.49 for various business expenses. Sales King disbursed $57,850 to BVP for picking and packing costs, leaving a balance of $96,597.20. Sales King allegedly retained this balance to apply to preharvest advances it made to BVP. Simplot claims it received no payments from the 1995 onion crop.

¶ 8 BVP's 1996 onion crop produced a total of only $2199.93 in sales proceeds. Of this amount, Sales King retained $338.87 in sales commissions and the balance for various business expenses. Simplot claims it received no payments from the 1996 onion crop, either.

¶ 9 In August 1996, Simplot filed a complaint in First District Court, Box Elder County, against BVP and Virgil Anderson, the personal guarantor for the credit Simplot extended to BVP, for breach of contract, and against Sales King for conversion of crop proceeds belonging to Simplot. In June 1998, the district court granted Simplot's motion for summary judgment as against BVP and Anderson. That judgment is not on appeal.

¶ 10 Thereafter, in February 1999, the district court granted Simplot's motion for sum-

2. To be effective under Utah law, the financing statement for an agricultural lien must be filed with the Central Filing System within the Utah Division of Corporations and Commercial Code. *See* Utah Admin.Code R154–1–2.

mary judgment against Sales King. It is from that judgment that Sales King now appeals.

¶ 11 On appeal, Sales King argues that although Simplot properly filed its financing statement with the Central Filing System within the Utah Division of Corporations and Commercial Code, the trial court erred in granting summary judgment because (1) Simplot represented to Sales King that Simplot would terminate its security interest in BVP's 1995 and 1996 crops; (2) Sales King's marketing agreement granted Sales King rights under Utah Code Ann. § 70A–9–318 [3] giving Sales King priority over Simplot's security interest; (3) Simplot cannot claim sales proceeds that Sales King used to pay expenses incurred or paid in the ordinary course of business; and (4) Simplot impliedly authorized Sales King to use the sale proceeds to cover business expenses.

¶ 12 Simplot counters that by filing its financing statement with the proper state agency as required by Utah law, it had a perfected security interest in BVP's 1995 and 1996 crop proceeds. By perfecting its security interest, Simplot argues, it met its burden and gave notice to all other creditors that it had priority over any unperfected or later perfected security interests. In addition, Simplot avers that because Sales King filed its financing statement with the Box Elder County recorder, which was not the proper place to file under Utah law, Sales King was an unsecured creditor and Simplot's interest had priority. Therefore, Simplot argues, Sales King's affirmative defenses or alleged errors are not well taken and Simplot was entitled to summary judgment as a matter of law.

## SCOPE OF REVIEW

■■■ ¶ 13 Summary judgment is appropriate only if there has been a showing "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Utah R.Civ.P. 56(c), *quoted in Dairy Prod. Serv., Inc., v. Wellsville,* 2000 UT 81, ¶ 15, 13 P.3d 581. Therefore, when we review the district court's decision to grant summary judgment, we review the court's legal decisions for correctness, giving no deference, and review "the facts and inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Dairy Prod. Serv.,* 2000 UT 81 at ¶ 15, 13 P.3d 581 (citing *Tretheway v. Miracle Mortgage, Inc.,* 2000 UT 12, ¶ 2, 995 P.2d 599).

## ANALYSIS

### I. SECURITY INTERESTS

■■■ ¶ 14 Part of the underlying purpose of the UCC is to "simplify, clarify and modernize the law governing commercial transactions." Utah Code Ann. § 70A–1–102(2) (1997); *see also Insley Mfg. Corp. v. Draper Bank & Trust,* 717 P.2d 1341, 1346 (Utah 1986) (noting that "[a] secured party should be able to rely on his compliance with the Code's requirements for perfection"); 79 C.J.S. *Secured Transactions* § 2 (1995) (stating that the code's "general purpose is to create a precise guide for commercial transactions under which businessmen may predict with confidence the results of their dealings"). Furthermore, "[t]he fundamental purpose of Article 9 [4] is to give notice to third persons and simplify the filing process." 9 Ronald A. Anderson & Lary Lawrence, *Anderson on the Uniform Commercial Code* § 401:5, at 483 (3d ed. rev.1999); *see also Insley,* 717 P.2d at 1345 ("The purpose and concept of notice filing would be significantly weakened if we held that [the party] is not bound by that which it would have discovered through a proper inquiry."); 79 C.J.S. *supra,* § 53, at 438 (stating that purpose of filing includes protection of creditor "by furnishing to others intending to enter into a transaction with the debtor a starting point for investigation which will result in fair warning with respect to the transaction contemplated"). As such, a party who has secured its interest in accordance with article 9 has priority, upon a debtor's default, "over 'anyone anywhere, anyhow' except as otherwise provided by the remaining Code priority rules." *Insley,* 717 P.2d at 1347 (quoting *Continental*

---

3. This section discusses the rights of an account debtor in relation to an assignor and an assignee.

4. Article 9 of the UCC governs secured transactions.

*Am. Life Ins. Co. v. Griffin,* 251 Ga. 412, 306 S.E.2d 285, 287 (1983)); *see also* Anderson & Lawrence, *supra,* § 9–312:6, at 330 (noting that conflicts of security interests are determined exclusively by article 9).

¶ 15 A security interest is defined as "an interest in personal property or fixtures which secures payment or performance of an obligation," Utah Code Ann. § 70A–1–201(37)(a) (Supp.2000), and a security agreement is any "agreement which creates or provides for a security interest," *id.* § 70A–9–105(1)(n) (Supp.2000). Additionally, "[e]xcept as otherwise provided by this act a security agreement is effective according to its terms between the parties, against purchasers of the collateral and against creditors." *Id.* § 70A–9–201 (1997). However, a security interest is not enforceable against a debtor or a third party unless the security interest has attached. *See id.* § 70A–9–203(1) (1997).

¶ 16 In order to attach, the debtor must have signed a security agreement containing a description of the collateral and, in the case of crops, a description of the land concerned.[5] *See id.* § 70A–9–203(1)(a). Attachment also requires that value has been given and that the debtor has rights in the collateral. *See id.* Once all these requirements have been met, the security interest attaches, it is enforceable against the debtor and third parties, *see id.* § 70A–9–203(2), and the secured party is automatically given a security interest in the proceeds as well, *see id.* §§ 70A–9–203(3), –306(2), (3) (1997).

¶ 17 There may be several creditors with security interests in the same property, and therefore, there are priority rules to establish which creditor's security interest prevails. These priority rules depend on a combination of factors including the type of property involved, the type of security interest, when the security agreement attached, and whether the security interest was perfected. *See* Anderson & Lawrence, *supra* ¶ 14, § 9–312:7, at 331.

¶ 18 In the instant case, there is no issue regarding whether BVP had rights in the collateral, or whether value was given. Therefore, to determine whether Simplot or Sales King had enforceable security agreements, ones which had attached, we need determine only whether BVP signed security agreements with each party containing descriptions of the collateral and the land concerned.

¶ 19 Each year that Simplot extended credit to BVP, Simplot had BVP sign both a commercial sales agreement and a security agreement. The security agreement claimed a security interest in the onions grown on BVP's land in Box Elder County, Utah, as well as in the proceeds from the onion crops. A legal description of the land was also attached to the security agreement. Therefore, Simplot had a security interest in BVP's onions and all proceeds, and that security interest had attached and was thereby enforceable.

¶ 20 In 1994, BVP and Sales King entered into a marketing agreement in which Sales King agreed to be a marketing agent for BVP's squash and onion crops in exchange for a commission and expenses. The marketing agreement included a description of BVP's property and of the crops Sales King would handle for BVP. Therefore, Sales King also had a security interest in BVP's crops, including onions, and the proceeds from the sale of those crops. Additionally, Sales King's security interest had attached and was enforceable.

¶ 21 Because both Simplot and Sales King had security interests in BVP's onion crops, and both those security interests had attached, it must be determined whose security interest had priority. To do this, we must consider whether either interest had been perfected.

¶ 22 Perfection means that the secured party has taken all the steps required under article 9 to bring the interest to completion and establish a priority. *See* Anderson & Lawrence, *supra* ¶ 14, § 9–301:11, at 51; 79 C.J.S. *Secured Transac-*

---

**5.** "For the purposes of this chapter any description of personal property or ... real estate is sufficient whether or not it is specific if it reasonably identifies what is described." Utah Code Ann. § 70A–9–110 (1997).

*tions* § 50, at 433. To perfect a security interest in collateral such as BVP's crops, that interest must have attached, *see* Utah Code Ann. § 70A–9–303(1) (1997), and a financing statement must be filed, *see id.* § 70A–9–302(1) (1997). Furthermore,

> (3) The security interest in proceeds is a continuously perfected security interest if the interest in the original collateral was perfected but it ceases to be a perfected security interest and becomes unperfected ten days after receipt of the proceeds by the debtor unless:
>
> . . .
>
> (b) a filed financing statement covers the original collateral and the proceeds are identifiable cash proceeds.

*Id.* § 70A–9–306(3).

¶ 23 Under Utah law, to perfect a security interest in goods, the financing statement must be filed with the Division of Corporations and Commercial Code, *see id.* § 70A–9–401(1) (1997), and the Central Filing System within this division is the only place within the state of Utah for filing agricultural liens, *see* Utah Admin. Code R154–1–2. However, if a filing is made in good faith in an improper place, it is effective "against any person who has knowledge of or notice of the contents of such financing statement." Utah Code Ann. § 70A–9–401(2). Furthermore, any agricultural filing that does not specify a particular crop year is effective for a period of five years. *See id.* § 70A–9–403(2) (Supp.2000); Utah Admin.Code R154–1–4, –5.

¶ 24 A perfected security interest usually takes priority over an unperfected security interest. *See* Utah Code Ann. §§ 70A–9–301, –312 (1997); *see also* Anderson & Lawrence, *supra* ¶ 14, § 9–312:9, at 338. However, under the Utah Code,

> a secured party may not enforce a security interest in farm products against a . . . selling agent who purchases or sells farm products in the ordinary course of business from or for a person engaged in farming operations *unless the secured party has complied with the rules issued by the director of the Division of Corporations and Commercial Code* under authority granted by Section 70A–9–400.

Utah Code Ann. § 70A–9–307(4) (1997) (emphasis added). In addition,

> [a] perfected security interest in crops for new value given to enable the debtor to produce the crops during the production season and given not more than three months before the crops become growing crops by planting or otherwise takes priority over an earlier perfected security interest to the extent that such earlier interest secures obligations due more than six months before the crops become growing crops by planting or otherwise, even though the person giving new value had knowledge of the earlier security interest.

*Id.* § 70A–9–312.

 ¶ 25 In the case before us, Simplot had BVP sign a new security agreement each year, and consequently, Simplot's security interest attached for each crop year. In addition, Simplot filed its financing statement with the Utah Department of Commerce, Division of Corporations and Commercial Code, Central Filing System in May 1993. The financing statement specified that Simplot retained a security interest in BVP's Box Elder County onion crops and all proceeds from such, and included a legal description of the land concerned. Because no particular crop year was specified on the financing statement, Simplot's filing was effective for five years, until 1998. Therefore, Simplot's security interest in BVP's 1995 and 1996 onion crops and proceeds was perfected. In addition, because Sales King kept accounting records of all BVP's proceeds by crop type, the proceeds were identifiable, and Simplot's perfected security interest in the proceeds continued.

 ¶ 26 Sales King, on the other hand, filed a financing statement with the Box Elder County recorder in April 1995 claiming a security interest in all BVP's crops and in the proceeds from those crops. Under Utah law, the Box Elder County recorder is not the proper place to file an agricultural lien. Nevertheless, in accordance with section 70A–9–401(2), if we assume that Sales King filed this financing statement in good faith, even though filed in an improper place, its filing would be effec-

tive against Simplot, but only if Simplot had knowledge of or notice of the contents of the financing statement. However, Sales King has offered no evidence of such knowledge on Simplot's part. Therefore, Sales King's filing was ineffective, and though it had a security interest in BVP's onion crops and proceeds, Sales King's interest was not perfected.

¶ 27 Because Simplot complied with the rules issued by the Division of Corporations and Commercial Code and had a properly filed and perfected security interest in BVP's onion crops and proceeds, Simplot's interest in the onion crops and proceeds takes priority over Sales King's unperfected security interest.

## II. AFFIRMATIVE DEFENSES

### A. Release of Security Interest

¶ 28 Sales King asserts on appeal that statements Simplot personnel allegedly made to Sales King personnel early in 1995 led Sales King to understand that Simplot would terminate its security interest in BVP's crops from that point forward. Thus, Sales King claims that Simplot is estopped from asserting an interest in BVP's 1995 and 1996 onion crops and proceeds. Simplot counters that the alleged statements referred only to the 1994 crop and furthermore that Sales King did not rely on any such alleged statements. Therefore, Simplot argues, Sales King's defense must fail as a matter of law.

¶ 29 General principles of law and equity are meant to supplement the provisions of the UCC unless displaced by its particular provisions. See Utah Code Ann. § 70A–1–103 (1997). Accordingly, the law of estoppel is applicable in the instant case. In Utah, the elements of promissory estoppel are:

"(1) The [promisee] acted with prudence and in reasonable reliance on a promise made by the [promisor]; (2) the [promisor] knew that the [promisee] had relied on the promise which the [promisor] should reasonably expect to induce action or forbearance on the part of the [promisee] or a third person; (3) the [promisor] was aware

of all material facts; and (4) the [promisee] relied on the promise and the reliance resulted in a loss to the [promisee]."

*Nunley v. Westates Casing Servs., Inc.,* 1999 UT 100, ¶ 35, 989 P.2d 1077 (quoting *Skanchy v. Calcados Ortope S.A.,* 952 P.2d 1071, 1077 (Utah 1998)). In addition, a promisee must support a promissory estoppel claim with more than a subjective understanding of the promisor's statements. *See Nunley,* 1999 UT at ¶ 36, 989 P.2d 1077. The claim must show evidence of a reasonably certain and definite promise. *See id.*

¶ 30 In the case before us, the Sales King Rep stated in her deposition that in January 1995, she had a discussion with Simplot's credit manager for the BVP account regarding BVP's 1994 crop proceeds. The Sales King Rep alleged that she asked Simplot's credit manager to send her a letter indicating that the payment Sales King made to Simplot was full and final payment for BVP's 1994 crop and that because Simplot had been paid in full, Simplot would "be releasing the UCC's." The Sales King Rep claimed that after contacting the Simplot credit manager once more, she eventually received a letter in which the second paragraph indicated that Simplot was paid in full and would release its UCC interest. Sales King did not produce the letter in support of this allegation.

¶ 31 The Sales King Rep also explained in her deposition that in 1995, she had written a letter to the Sales King attorneys requesting they do a UCC check on BVP. However, due to Sales King's office procedures, the Sales King Rep only initiated the request and therefore does not know whether the Sales King attorneys acted on her request.

¶ 32 Even viewing the facts and inferences in a light most favorable to Sales King and assuming that Sales King's reliance on Simplot's alleged promise was reasonable, Sales King's promissory estoppel argument must fail. First, Sales King did not provide evidence that Simplot's alleged promise was certain or definite. Sales King's only evidence is a subjective understanding as to what Simplot's alleged statements meant. As a matter of law, this is not adequate support for a claim of promissory estoppel.

¶ 33 Furthermore, Sales King provided no evidence that Simplot knew Sales King relied on the alleged promise. This is a required element of promissory estoppel, and therefore, Sales King's argument fails as a matter of law.

¶ 34 Finally, the Sales King Rep claimed that she requested the company attorneys check for any UCC liens against BVP. This action indicates that Sales King did not rely on Simplot's alleged promise, and therefore, promissory estoppel is not evident.

¶ 35 Because Sales King did not meet the required elements of promissory estoppel, its argument fails as a matter of law. Therefore, the district court did not err in denying Sales King's reliance argument.

### B. Utah Code Ann. § 70A–9–318

 ¶ 36 Sales King claims on appeal that because it was BVP's marketing agent, and BVP's expenses were handled by Sales King through their marketing agreement, Utah Code Ann. § 70A–9–318 applies to the situation. Simplot counters that the section cited by Sales King applies only to assignments between a secured party or creditor and its assignee and therefore is inapplicable.

¶ 37 We must agree with Simplot. Section 70A–9–318 deals exclusively with the rights of an account debtor in relation to assignees and assignors of the account. *See* Utah Code Ann. § 70A–9–318 (1997); *see also* Anderson & Lawrence, *supra* ¶ 14, § 9–318:5, at 444 ("The defenses and limitations contained in UCC § 9–318 are only available to an 'account debtor.' "). The account debtor is the one obligated on the account. *See* Utah Code Ann. § 70A–9–105(1)(a). In this case, BVP is the account debtor.

 ¶ 38 Nevertheless, Sales King seems to be attempting to treat its marketing agreement as an assignment by analogy and thus to put itself in the position of an account debtor. However, Sales King has offered no evidence that the marketing agreement is an assignment, and the agreement itself does not support this premise. Therefore, section 70A–9–318 is inapposite, and the district court did not err in concluding that this argument failed as a matter of law.

### C. Expenses Incurred or Paid in the Ordinary Course of Business

 ¶ 39 Sales King claims that unless a secured party such as Simplot takes measures to enforce or preserve its interest in proceeds, the debtor may use the proceeds to pay ordinary business expenses because the secured party has essentially lost its interest. Sales King relies on a UCC official comment that provides:

> Where cash proceeds are covered into the *debtor's checking account* and paid out in the *operation of the debtor's business,* recipients of the funds of course take free of any claim which the secured party may have in them as proceeds. What has been said relates to payments and transfers in ordinary course.

Unif. Commercial Code § 9–306 cmt. 2(c) (amended 1972), 3A U.L.A. 166 (1992) (emphasis added) [hereinafter Comment 2(c)]. Sales King contends that because it kept BVP's proceeds to cover expenses made in the ordinary course of business that were related to the sale of BVP's crops, Sales King's claim on the funds was free of Simplot's claim.

 ¶ 40 The official comments to the UCC have not been adopted by the Utah legislature and are therefore not authoritative, but rather, persuasive as to the code's interpretation. Nor is it the case that this court has previously recognized Comment 2(c) as an exception to the Code's general priority rules. However, we find it unnecessary to address the authority of Comment 2(c) at this time because it is not applicable to the instant case.

 ¶ 41 Comment 2(c) provides that recipients take free of a senior security interest only if the "cash proceeds are covered into the debtor's checking account and paid out in the operation of the debtor's business." This "presupposes an account over which the debtor exercises control, into which the debtor voluntarily makes deposits, and from which the debtor voluntarily makes payments to third parties who take in good faith." *Barber–Greene Co. v. Nat'l City Bank of Minneapolis,* 816 F.2d 1267, 1271 (8th Cir.

1987); *see also Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 2000 WL 174955, at *6, 2000 U.S. Dist. LEXIS 1438, at *18 (S.D.N.Y. Feb. 15, 2000); *UCC Secured Transactions* § 24.07(4) (Matthew Bender & Co., Inc.2000), *available in* LEXIS, Commercial Law (UCC) File (stating that Comment 2(c) "addresses transactions where the cash proceeds are first placed in the debtor's checking account and then paid out to the transferee").

¶ 42 Here, the debtor, BVP, never had access or control over the cash proceeds. Instead, Sales King paid itself from the proceeds realized by the sale of BVP's crops before BVP received any payment. This situation more closely resembles a conflict between a perfected security interest and a right of setoff. *See Insley Mfg. Corp. v. Draper Bank & Trust*, 717 P.2d 1341, 1347 (Utah 1986) (ruling that perfected security interest prevails over a right of setoff); *First Sec. Bank of Utah v. Utah Turkey Growers, Inc.*, 610 P.2d 329, 334 (Utah 1980) (holding that setoff was improper). Therefore, Comment 2(c) is inapplicable and the district court did not err in rejecting this argument as a matter of law.

### D. Implied Authorization

¶ 43 Sales King claims on appeal that Simplot's credit policies impliedly authorized Sales King to use the proceeds from BVP's crop sales. In particular, Sales King notes that Simplot did not require periodic payments from BVP and Simplot generally based extension of credit on projected net revenues. In addition, Sales King notes that the credit Simplot extended to BVP for the 1995 crop was not due until January 1996. Sales King claims that because harvesting and marketing of the 1995 crop occurred in the fall, this is further evidence that Simplot authorized all marketing expenses for BVP's 1995 crop be paid first.

¶ 44 The Utah Code provides that "[a] security interest is not invalid or fraudulent against creditors . . . by reason of the failure of the secured party to require the debtor to account for proceeds." Utah Code Ann. § 70A–9–205 (1997). Furthermore, we have already noted *supra* that when a party has secured its interest in accordance with article 9, that party has priority unless otherwise provided by the UCC priority rules. *See Insley*, 717 P.2d at 1347.

¶ 45 It follows, therefore, that Simplot had no duty to require periodic payments from BVP to ensure that proceeds from sale of its collateral were being used to reduce BVP's debt to Simplot. Simplot's only duties were to properly file and perfect its security interest and to inquire as to whether there were any security interests superior to its own. It is critical to maintain the purpose and concept of notice filing. Therefore, we refuse to accept Sales King's attempts to create priority rules where none exist under the UCC. The district court was correct in concluding that this argument failed as a matter of law.

### CONCLUSION

¶ 46 We affirm the district court's conclusions that (1) Simplot had a perfected security interest in BVP's onion crops and onion crop proceeds that had priority over Sales King's unperfected security interest in the same; and (2) Sales King's affirmative defenses failed as a matter of law. Hence, the district court did not err in granting Simplot summary judgment as a matter of law.

¶ 47 Chief Justice HOWE, Justice DURHAM, Justice DURRANT, and Judge THORNE concur in Associate Chief Justice RUSSON's opinion.

¶ 48 Having disqualified himself, Justice WILKINS does not participate herein; Court of Appeals Judge THORNE sat.