2001 UT 24

James K. RAWSON, trustee, and Rebecca R. Rawson, trustee, Plaintiffs and Petitioners,

v.

Kim Edward CONOVER and Karen Jane Conover, dba K & K Sales; K & K Sales, Inc., a corporation; Paul W. Clark; and Old Republic Surety Co., a corporation, Defendants and Respondents.

No. 990935.

Supreme Court of Utah.

March 9, 2001.

Ray G. Martineau, Anthony R. Martineau, Salt Lake City, and Leslie W. Slaugh, Provo, for plaintiffs.

T. Richard Davis, Salt Lake City, for defendants.

RUSSON, Associate Chief Justice:

¶ 1 On writ of certiorari, James and Rebecca Rawson seek review of the Utah Court of Appeals' memorandum decision affirming Judge Brian's and Judge Iwasaki's grants of summary judgment in favor of Kim and Karen Conover, Paul Clark, K & K Sales, Inc. ("K & K Sales"), and Old Republic Surety Co. ("Old Republic") (collectively, "defendants"). We affirm.

## BACKGROUND

¶2 K & K Sales was a licensed motor vehicle dealership owned by Kim and Karen Conover and bonded by Old Republic. Paul Clark is a friend of the Conovers. In October 1992, Clark attended an auto auction with Kim Conover. Clark claimed he was interested in purchasing a family vehicle at the auction. However, because only licensed auto dealers are allowed to participate in the auto auctions, Kim Conover, as K & K Sales, purchased a salvaged 1989 Ford Aerostar van (the "van") for Clark. At the time of the sale, Kim Conover and Clark were told the van had suffered structural damage in an accident. Clark claimed he intended to have the van repaired and restored for use by his wife and family, and Kim Conover estimated that the repairs could be fairly easily performed.

¶3 Over the ten months following the purchase of the van, Clark contracted with various parts and repair shops to restore the vehicle. He claimed that he neither supervised nor performed any of the repairs himself though he did pay for all parts and service performed. During this period, title to the van remained in the name of K & K Sales; however, Kim Conover claimed that he did not supervise, perform, or inspect any of the repairs on the van except to replace the windshield.

¶4 Clark claimed that after the van was substantially repaired, his wife test drove it, but finding it too long to maneuver, she did not want to keep it. Therefore, Clark put an ad in the newspaper to find a buyer for the van and listed his home phone number as the contact.

¶5 In July 1993, the Rawsons saw the newspaper ad and called Clark. They arranged to see the van and went to Clark's home. The Rawsons test drove the van with Clark riding along. The Rawsons said that Clark told them the van had been in an accident and was salvaged; the front end had been damaged, so it had been rebuilt. The Rawsons told Clark they had five children and it was important to them that they have a safe vehicle. They claimed that Clark told them the van had been "properly repaired" and because he had intended to use the van for his wife and family, he felt it was safe. Clark also showed the Rawsons an itemized list of the costs for the repairs done on the van.

¶6 In addition, Clark agreed to allow the Rawsons to have their own mechanic inspect the van as long as Clark accompanied the vehicle. However, the Rawsons declined to do so. They stated in their depositions that they did not look at or ask to look at any part of the van that had been rebuilt. They did, however, request that Clark have it safety inspected, which he did.

¶7 A few days after first looking at the van, in early August 1993, the Rawsons called Clark and agreed to purchase it. They met Clark at the Department of Motor Vehicles in Rose Park to effectuate the sale. It was at that time that Clark explained to the Rawsons that the van was actually registered to K & K Sales. Therefore, Clark explained, Kim Conover, as K & K Sales, had signed the registration over to the Rawsons, and there were a few documents Clark wanted the Rawsons to sign.

¶8 The registration, which James Rawson claimed he read before signing, indicated that the van was "Rebuilt" and had a "Utah Salvage Title." James Rawson also signed a K & K sales agreement at the time of purchase that stated the van was used and a rebuilt salvage. The pertinent terms on the back of the sales agreement stated:

1. Purchaser warrants that he has inspected the vehicle to his satisfaction and purchases the vehicle "AS IS." If purchaser has not inspected the vehicle, he waives his right to do so.

. . . .

5. NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTY OF MERCHANTABILITY OF [sic] FITNESS FOR A PARTICULAR PURPOSE, ARE MADE BY K & K WITH RESPECT TO THE USED MOTOR VEHICLE OR MOTOR VEHICLE CHASSIS FURNISHED HEREUNDER EXCEPT AS MAY BE EXPRESSED IN WRITING BY K & K FOR SUCH

USED MOTOR VEHICLE OR MO-
TOR CHASSIS. WHICH WARRAN-
TY, IF SO EXPRESSED IN WRIT-
ING IS INCORPORATED HEREIN
AND MADE A PART HEREOF.

6. The vehicle covered by this agreement may be a rebuilt or restored vehicle as defined by U.C.A. § 41–1–36.5(1)(a) and § 41–1–36.6(9). Purchaser acknowledges that this has been disclosed and that purchaser has seen the previous title or salvage certificate.

. . . .

10. Purchaser agrees to secure all necessary inspections to facilitate licensing and restoration of the vehicle. Purchaser agrees to indemnify and hold harmless K & K from any damages that may arise from the failure of purchaser to secure inspections. The vehicle is sold "AS IS" and purchaser is solely responsible for obtaining necessary inspections.

. . . .

19. No agreement, verbal or otherwise, not contained in writing in this agreement on this document will be recognized.

James Rawson stated in his deposition that even though he only glanced at the terms and conditions when he signed the sales agreement, he did understand he was purchasing a vehicle without a warranty in "as is" condition.

¶ 9 Finally, as part of the purchase, James Rawson signed a document entitled "Buyers Guide." On the front of the document in very large bolded type were the words "**AS IS—NO WARRANTY.**" The box next to this statement had been checked. At the top of this document was the statement "IMPORTANT: Spoken promises are difficult to enforce. Ask the dealer to put all promises in writing. Keep this form." Further down, the words "Vehicle is a rebuilt salvage title" were handwritten. The second page of this document listed several major defects that could occur in used motor vehicles, and at the bottom was the statement "Important: The information on this form is part of any contract to buy this vehicle. Removal of this label before consumer purchase (except for purpose of test-driving) is a violation of federal law (16 C.F.R. 455)." James Rawson stated in his deposition that even though he did not read the document closely before signing it, he did notice that there was no warranty and that the vehicle was being sold "as is."

¶ 10 James Rawson agreed in his deposition that Kim Conover, individually or as K & K Sales, made no oral representations at all concerning the condition of the van and no written representations aside from the documents discussed above. In fact, at no time before the sale did the Rawsons meet or talk to Kim Conover or visit the premises of K & K Sales. Furthermore, when asked in his deposition whether he considered any verbal statement by Clark to be a warranty concerning the vehicle, James Rawson replied, "No."

¶ 11 After signing all the documents and paying the registration, sales tax, and purchase price, the Rawsons took possession of the van. Thereafter, they drove the van without incident until they were involved in an accident in December 1993. There are no allegations that any defect in the van caused the accident.

¶ 12 After the Rawsons' accident, the Rawsons' insurance company estimated the repairs and authorized their completion. The Rawsons then authorized their mechanic shop to perform the repairs. However, once the mechanics proceeded with the repairs, they claimed they could not get the parts to fit, and therefore, they completely disassembled the inside of the van. At that point, the mechanics discovered what they believed to be extensive damage remaining from the first accident, prior to Clark's purchase of the van at the auto auction. They then refused to make all the repairs they believed to be necessary for the amount that had been estimated by the insurance company, and they refused to be responsible for repairing the vehicle without performing all the additional repairs. The mechanics claimed that the repairs from the first accident had not been performed to industry standards and that the van was not safe.

¶ 13 The mechanic shop claimed it notified the insurance company that the necessary repairs would be $2000 to $4000 more than originally estimated. The insurance company allegedly refused to pay for the prior damage and therefore declared the van to be totaled.

¶ 14 In March 1994, the Rawsons filed a complaint against defendants in third district court, claiming intent to defraud, tortious misrepresentations, deceptive and unconscionable acts and practices, breach of covenants of good faith and fair dealing, punitive damages, equitable estoppel, surety liability, and breach of express and implied warranties. Defendants denied the charges.

¶ 15 In September 1995, the court, on its own motion, ordered the parties to show cause why the case should not be dismissed for failure to prosecute. The parties appeared, and a nonjury trial was scheduled. However, on the date set for trial, May 2, 1996, the parties stipulated to strike the trial and proceed on cross-motions for summary judgment.

¶ 16 Defendants' motion for summary judgment argued that the Rawsons had failed to allege or specify any actions that served as violations of any of the statutes or regulations claimed by the Rawsons. In opposition to defendants' motion, the Rawsons argued that Clark's affirmations and representations served as express and implied warranties for the condition of the van. In addition, the Rawsons asserted that the van was sold to them in furtherance of a common enterprise to cause them harm. Defendants replied to the Rawsons' arguments. However, the Rawsons did not make a cross-motion for summary judgment.

¶ 17 Judge Brian ordered partial summary judgment, concluding that the Rawsons failed to set forth any factual evidence to support their claims of intent to defraud, tortious misrepresentations, deceptive and unconscionable acts and practices, breach of the covenants of good faith and fair dealing, punitive

damages, and equitable estoppel. The remaining claims of surety liability[1] and breach of express and implied warranties were set over for bench trial.

¶ 18 Before Judge Brian signed his judgment, the Rawsons objected, arguing that ample evidence existed in the record to establish their other claims as a matter of fact. Nevertheless, Judge Brian's judgment was ordered on October 4, 1996.

¶ 19 The Rawsons requested that Judge Brian recuse himself, which he did. Judge Iwasaki was then assigned to the case.

¶ 20 After further discovery but before trial, defendants moved for summary judgment, arguing that no warranties had been made and that the Rawsons acknowledged they were purchasing the van in the condition in which they found it. The Rawsons responded that Judge Iwasaki could not hear a summary judgment motion on issues on which Judge Brian had already ruled. They further argued that the warranty disclaimers were inadequate and ambiguous, and thus, open to interpretation by a fact finder.

¶ 21 Judge Iwasaki granted summary judgment to defendants, and the Rawsons appealed both Judge Brian's and Judge Iwasaki's orders.[2] The court of appeals issued a memorandum decision holding that the Rawsons addressed only the issues of express and implied warranties in their memorandum in opposition to defendants' first motion for summary judgment and the affidavits submitted in support thereof. Therefore, the court of appeals affirmed Judge Brian's grant of summary judgment.

¶ 22 As to Judge Iwasaki's grant of summary judgment, the court of appeals held that because James Rawson admitted he did not rely on any oral representations regarding the condition of the vehicle, the written documents represented the entire agreement between the parties. The court of appeals further held that under the Utah Commercial Code, by signing the contract and declining

---

1. Surety liability was dependant on whether defendants could be found liable under any cause of action.

2. The Rawsons appealed to the Utah Supreme Court, which poured the case over to the court of appeals pursuant to section 78-2-2. *See* Utah Code Ann. § 78-2-2(4) (1996); Utah R.App. P. 42(a).

to have the vehicle inspected, the Rawsons waived all express and implied warranties. The Rawsons then petitioned this court for a writ of certiorari, which we granted.

¶ 23 On certiorari, the Rawsons argue that (1) their memorandum in opposition to defendants' first motion for summary judgment and supporting affidavits did assert arguments to support the claims dismissed by Judge Brian's grant of summary judgment, and (2) they did not waive their claims for breach of implied and express warranties.

¶ 24 In response, defendants argue that the Rawsons made only general claims of violations of several statutes with no citations and no descriptions of any specific standards allegedly breached by defendants. Furthermore, defendants contend the Rawsons provided no specific fraudulent misrepresentation by defendants and no evidence of intent to defraud. Therefore, they argue, Judge Brian's grant of summary judgment was correct. Defendants also contend that Judge Iwasaki's grant of summary judgment was correct because defendants made no material breach of any warranties concerning the van.

## STANDARD OF REVIEW

¶ 25 " 'On certiorari, we review the decision of the court of appeals, not of the trial court.' " *Brown v. Glover*, 2000 UT 89, ¶ 15, 16 P.3d 540 (quoting *Lysenko v. Sawaya*, 2000 UT 58, ¶ 15, 7 P.3d 783). Furthermore, summary judgment should be granted only if there has been a showing "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). When reviewing a trial court's grant of summary judgment, we review the legal decisions for correctness, without deference. *See J.R. Simplot Co. v. Sales King Int'l, Inc.*, 2000 UT 92, ¶ 13, 17 P.3d 1100. Additionally, we review " 'the facts and inferences to be drawn therefrom in the light most favorable to the nonmoving party.' " *Id.* (quoting *Dairy Prod. Servs., Inc. v. Wellsville*, 2000 UT 81, ¶ 15, 13 P.3d 581). However, in response to a motion for summary judgment, "an adverse party may not rest upon the mere allegations or denials of his pleading, but his response ... must set

forth specific facts showing that there is a genuine issue for trial." Utah R. Civ. P. 56(e).

## ANALYSIS

### I. INITIAL GRANT OF SUMMARY JUDGMENT

¶ 26 On certiorari, the Rawsons argue that contrary to the court of appeals' conclusion, the Rawsons' memorandum in opposition to defendants' first motion for summary judgment and the supporting affidavits provided sufficient evidentiary support for their claims of fraud, tortious misrepresentation, deceptive and unconscionable acts and practices, and breach of the covenants of good faith and fair dealing. Therefore, they contend that the court of appeals erred in affirming Judge Brian's grant of summary judgment.

### A. *Fraud and Tortious Misrepresentation*

¶ 27 First, tortious misrepresentation includes both intentional misrepresentation, or fraud, and negligent misrepresentation. We address each separately.

¶ 28 "Fraud is 'a false representation of an existing material fact, made knowingly or recklessly for the purpose of inducing reliance thereon, upon which plaintiff reasonably relies to his detriment.' " *Tretheway v. Miracle Mortgage, Inc.*, 2000 UT 12, ¶ 8, 995 P.2d 599 (quoting *Schwartz v. Tanner*, 576 P.2d 873, 875 (Utah 1978)). To have made a false representation recklessly, defendants would have to know they had insufficient knowledge upon which to base the representation made. *See Nova Cas. Co. v. Able Constr., Inc.*, 1999 UT 69, ¶ 11, 983 P.2d 575.

¶ 29 The Rawsons' memorandum opposing defendants' first motion for summary judgment contains statements claiming that the repairs had not been properly or professionally done and that the van was unsafe to operate. However, the Rawsons' memorandum and supporting affidavits contain absolutely no evidentiary support that defendants knew the repairs to the vehicle had not been properly done.

¶ 30 Neither do the Rawsons provide any evidence that defendants knew they had insufficient knowledge upon which to base the statements that the repairs were done properly and the vehicle was safe. The list of repairs Clark provided the Rawsons included the costs for parts, body work, and frame work. The Rawsons do not supply any evidence that defendants should have known the body work and frame work were not properly done and the vehicle was unsafe. Therefore, the court of appeals was correct in affirming summary judgment on the claim of fraud.

¶ 31 Negligent misrepresentation occurs when a person supplies false information for the guidance of others in their business transactions, if the person supplying the information failed to exercise reasonable care or competence in obtaining it. *See Atkinson v. IHC Hosps., Inc.,* 798 P.2d 733, 737 (Utah 1990), *cert. denied,* 498 U.S. 1090, 111 S.Ct. 970, 112 L.Ed.2d 1056 (1991). Even though the Rawsons asserted that used motor vehicle dealers are subject to a higher duty, the Rawsons did not provide any legal basis for such an elevated duty, and none exists in Utah. Therefore, under negligent misrepresentation, the duty is to exercise reasonable care or competence in determining the information to be supplied to others for guidance in business transactions.

¶ 32 The Rawsons stated in their memorandum that Kim Conover, individually and as K & K Sales, actively engaged in the purchase, repair, and marketing of salvage and nonsalvage vehicles. Kim Conover had conceded this in answer to the Rawsons' amended complaint. The Rawsons also claimed that Clark, the Conovers, and K & K Sales acted as a common enterprise because Clark purchased and sold the van through K & K Sales.

¶ 33 However, " '[b]ald statements do not suffice to establish a genuine issue of material fact.' " *Dairy Prod. Servs., Inc. v. Wellsville,* 2000 UT 81, ¶ 24, 13 P.3d 581 (quoting *In re Smith,* 925 P.2d 169, 174 (Utah 1996) (other citations omitted)). In responding to defendants' motion for summary judgment, the Rawsons were required to "set forth specific facts showing that there [was] a genuine issue for trial." Utah R. Civ. P. 56(e).

¶ 34 The list of repairs Clark provided the Rawsons included the costs for parts, body work, and frame work. In their memorandum and supporting affidavits, the Rawsons did not set forth any specific facts showing that defendants had not used reasonable care and competence in determining whether the van was properly repaired and safe to drive. Therefore, the court of appeals was correct in affirming summary judgment on the claim of tortious misrepresentation, which includes negligent misrepresentation.

## B. Deceptive and Unconscionable Acts and Practices

¶ 35 Next, the Rawsons claim that their memorandum and supporting affidavits included sufficient evidence to support their claims of deceptive and unconscionable acts and practices under the Utah Consumer Sales Practices Act [3] ("Sales Practices Act") and the Utah Motor Vehicle Business Regulation Act [4] ("Motor Vehicle Act").

¶ 36 Under the Sales Practices Act, a supplier is any "seller, lessor, assignor, offeror, broker, or other person who regularly solicits, engages in, or enforces consumer transactions, whether or not he deals directly with the consumer." Utah Code Ann. § 13–11–3(6). In addition, "a supplier commits a deceptive act or practice if the supplier *knowingly or intentionally* ... (b) indicates that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not." *Id.* § 13–11–4(2)(b) (emphasis added). The Sales Practices Act, therefore, requires that the supplier knowingly or intentionally deceive the consumer. *See Wade v. Jobe,* 818 P.2d 1006, 1016 (Utah 1991); *State Div. of Consumer Prot. v. GAF Corp.,* 760 P.2d 310, 313 (Utah 1988) (noting that when Act was amended in 1985, it was to require intent to deceive before deceptive trade practice can be found).

---

3. *See* Utah Code Ann. §§ 13–11–1 to –23 (1999 & Supp.2000).

4. *See id.* §§ 41–3–101 to –803 (1998 & Supp. 2000).

¶ 37 It is undisputed that the Conovers and K & K Sales were suppliers. However, even if we review the facts and inferences in the light most favorable to the Rawsons and assume that Clark was a supplier, the Rawsons provided no evidence whatsoever that Clark, the Conovers, or K & K Sales knowingly or intentionally deceived the Rawsons. Therefore, the court of appeals correctly held that the Rawsons failed to assert any facts to support their claim under the Sales Practices Act.

¶ 38 In their complaint, the Rawsons averred that the "acts, failures to act, refusals to act, omissions and breaches of duty" of Clark, Kim Conover, and K & K Sales constituted deceptive and unconscionable acts under the Sales Practices Act and were undertaken and carried out "in knowing, purposeful, willful and malicious disregard and violation of the provisions of the Motor Vehicle Act." However, the Rawsons never cited, in either their complaint or their memorandum in opposition to defendants' motion for summary judgment, which sections of the Motor Vehicle Act had allegedly been violated.

¶ 39 Nevertheless, the Rawsons did state in their opposing memorandum that the sale of the van "was not negotiated or closed at K & K Sales business premises and by a licensed motor vehicle salesman as required by the Utah Motor Vehicle Act." In a close reading of the complaint, opposing memorandum, and supporting affidavits, this is the only allegation that can be found regarding violation of the Motor Vehicle Act.

¶ 40 The Motor Vehicle Act provides:

(1) The holder of any license issued under this chapter may not:

. . .

(b) intentionally publish, display, or circulate any advertising without identifying the seller as the licensee by including in the advertisement the full name under which the licensee is licensed or the licensee's number assigned by the division;

. . .

(n) sell, display for sale, or offer for sale motor vehicles at any location other than the principal place of business or additional places of business licensed under this chapter; this provision is construed to prevent dealers, salespersons, or any other representative of a dealership from selling, displaying, or offering motor vehicles for sale from their homes or other unlicensed locations. . . .

Utah Code Ann. § 41–3–210(1)(b), (n) (Supp. 2000). These are the only provisions of the Motor Vehicle Act that appear to be relevant to the Rawsons' averment that the sale of the van was not negotiated or completed at the K & K business premises.

¶ 41 The Rawsons have provided evidence that these provisions were violated: the van was registered to K & K Sales, but Clark advertised, showed, negotiated, and closed the sale; the van was shown and negotiations were conducted at Clark's home; the sale was completed at the Department of Motor Vehicles.

¶ 42 For the Rawsons to bring a claim under the Motor Vehicle Act, they must rely on its private right of action section that provides:

(1) A person may maintain an action against a dealer, crusher, or body shop on the corporate surety bond if:

(a) the person suffers a loss or damage because of:

(i) fraud;

(ii) fraudulent representation; or

(iii) a violation of Section 41–3–210; and

(b) the loss or damage results from the action of:

(i) a licensed dealer;

(ii) a licensed dealer's salesperson acting on behalf of the dealer or within the scope of the salesperson's employment. . . .

Id. § 41–3–404. Otherwise, it is the duty of the motor vehicle enforcement administrator to investigate any alleged violation of this chapter and to bring an action in the name of the state. See id. § 41–3–105(3)(a)(i), (b).

¶ 43 It has already been shown that the Rawsons did not supply evidence in their opposing memorandum or supporting affida-

vits of fraud or fraudulent representations. The Rawsons did, however, provide evidence of violations of the Motor Vehicle Act. Nevertheless, the Rawsons have not furnished any evidence that their losses were specifically due to the fact that the van was advertised without mentioning K & K Sales or because the van was sold from Clark's home. To bring a private action under the Motor Vehicle Act, the Rawsons had to furnish evidentiary support that their losses were due to violations of that Act. Because the Rawsons failed to do so, the court of appeals did not err in holding that the Rawsons failed to assert any facts to support their claim under the Motor Vehicle Act.

### C. Good Faith and Fair Dealing

¶ 44 The Utah Uniform Commercial Code ("Utah UCC") imposes a covenant of good faith for all commercial contracts, see Utah Code Ann. § 70A-1-203 (1997); see also St. Benedict's Dev. Co. v. St. Benedict's Hosp., 811 P.2d 194, 199 (Utah 1991), and under Utah common law, an implied covenant of good faith and fair dealing generally inheres to all contractual relationships, see Malibu Inv. Co. v. Sparks, 2000 UT 30, ¶ 19, 996 P.2d 1043. Under the covenant of good faith and fair dealing, each party promises not to "'intentionally or purposely do anything which will destroy or injure the other party's right to receive the fruits of a contract,'" id. at ¶ 19 (quoting St. Benedict's, 811 P.2d at 199), and to comply, a party must act consistently "with the agreed common purpose and the justified expectations of the other party," St. Benedict's, 811 P.2d at 200 (citing Restatement (Second) of Contracts § 205 cmt. a (1981)). In analyzing for compliance with the covenant, both the contract language and the course of dealings between the parties should be considered to determine the parties' purpose, intentions, and expectations. See id.

¶ 45 In the instant case, the contracts signed by the Rawsons clearly stated that the van was a salvage vehicle being sold "as is." The Rawsons acknowledged in their opposing memorandum and supporting affidavits that Clark told them the vehicle had been in an accident and was sold to him as salvage. Nevertheless, they claimed that they told Clark they wanted the van as a family vehicle and safety was therefore an issue. The Rawsons claimed Clark replied that the van had been properly repaired and he felt it was safe. The Rawsons acknowledged that they did not inspect the rebuilt portions of the van nor did they choose to accept Clark's offer to allow their own mechanic to inspect it. They requested only that Clark have the van safety inspected, and he complied.

¶ 46 Clark claimed that he purchased the van as a vehicle for his own family and contracted with third parties to have it rebuilt and repaired. He contended that he did not inspect the repairs, but decided not to keep the van only because his wife did not like the length, whereupon, he tried to sell it.

¶ 47 The language of the contract and the parties' conduct indicate that the Rawsons were interested in purchasing a reasonably safe, dependable family vehicle at a reduced cost. However, even though the Rawsons provided some evidence that the damage from the initial accident had not been properly repaired and that the van may have been unsafe, the Rawsons furnished no specific facts that defendants intentionally or purposefully did anything to defeat the Rawsons' expectations. Therefore, the court of appeals was correct in affirming Judge Brian's grant of summary judgment.

## II. WARRANTIES

¶ 48 The Rawsons contend on certiorari that the court of appeals erred in concluding that the Rawsons waived all express and implied warranties because they signed the K & K sales contract and declined to have the van inspected. We agree with the outcome of the court of appeals' decision.

### A. Implied Warranties

¶ 49 The Utah UCC provides that "[u]nless excluded or modified (Section 70A-2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Utah Code Ann. § 70A-2-314(1) (1997). In addition,

[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

*Id.* § 70A–2–315 (1997).

¶ 50 Section 70A–2–316 provides that "unless the circumstances indicate otherwise, all *implied* warranties are excluded by expressions like 'as is,' . . . which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no *implied* warranty." *Id.* § 70A–2–316(3)(a) (1997) (emphasis added). However, "to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous." *Id.* § 70A–2–316(2).

¶ 51 If we review the facts and inferences in the light most favorable to the Rawsons and assume, without deciding, that both the implied warranty of merchantability and the implied warranty of fitness for a particular purpose are applicable in this case, we still must hold that those implied warranties were excluded by the documents signed by the Rawsons.

¶ 52 The documents signed by James Rawson conspicuously and expressly excluded the implied warranties of fitness and merchantability. The terms of the K & K sales agreement[5] stated that the buyer purchased the vehicle "AS IS." It also stated in capital letters that "NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTY OF MERCHANTABILITY [OR] FITNESS FOR A PARTICULAR PURPOSE" were made with respect to the van. In addition, James Rawson signed the Buyers Guide that stated on the front in very large bolded type "**AS IS—NO WARRANTY.**" Furthermore, in his deposition, James Rawson acknowledged that when he was purchasing the van, he noticed and understood that it was being sold without a warranty and in "as is" condition. Therefore, the implied warranties of merchantability and fitness of purpose were excluded by the disclaimers in the sales documents.

¶ 53 In its memorandum decision, the court of appeals held that the Rawsons' failure to inspect the van contributed to the waiver of the warranties. However, the failure to inspect is only a waiver "with regard to defects which an examination ought in the circumstances to have revealed to him," Utah Code Ann. § 70A–2–316(3)(b), and there is evidence that an examination by the Rawsons or their mechanic would not have revealed the defects. Therefore, the court of appeals erred in concluding that the Rawsons' failure to inspect waived the implied warranties. Nevertheless, the implied warranties were excluded by the documents signed by the Rawsons.

### B. *Express Warranties*

¶ 54 Under the Utah UCC,

(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

. . . .

(2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a

---

5. A disclaimer found on the reverse side of a sales agreement is effective so long as it is not hidden in fine print. *See Billings Yamaha v. Rick*

*Warner Ford, Inc.*, 681 P.2d 1276, 1278 (Utah 1984) (citing *Christopher v. Larson Ford Sales, Inc.*, 557 P.2d 1009 (1976)).

statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

Utah Code Ann. § 70A–2–313(1)(a)(b), (2) (1997).

■ ¶ 55 A reasonable-person standard is used to determine whether the language of the seller is an affirmation of fact, promise, or description as opposed to the seller's opinion or commendation. *See State Div. of Consumer Prot. v. GAF Corp.,* 760 P.2d 310, 315 (Utah 1988). " 'If it is reasonable to conclude that a reasonable person would have ventured into the transaction on the basis of a particular statement,' an express warranty was made." *Id.* (quoting 3 R. Anderson, *Anderson on the Uniform Commercial Code,* § 2–313:50, at 44 (3d ed.1983)).

■ ¶ 56 The Utah UCC also provides:

(1) Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this chapter on parol or extrinsic evidence (Section 70A–2–202) negation or limitation is inoperative to the extent that such construction is unreasonable.

Utah Code Ann. § 70A–2–316(1). Accordingly,

[t]erms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement. . . .

*Id.* § 70A–2–202 (1997). Therefore, terms that might otherwise be considered a basis of the bargain are not express warranties if the final written contract effectively disclaims and/or excludes any such warranties. *See* 67A Am.Jur.2d *Sales* § 831 (1985); 3 Anderson, *supra* ¶ 55, §§ 2–313:71, 2–313:87, 2–313:290 (3d ed. rev.1995).

■ ¶ 57 The Rawsons contend that Clark told them the van had been properly repaired and he felt it was safe. Neverthe-less, James Rawson stated in his deposition that he did not consider any verbal statement made by Clark to be a warranty concerning the van. Therefore, it would appear that Clark's statements would not form the basis of the bargain.

■ ¶ 58 However, even if Clark's statements might be considered a basis for the bargain when viewed in the light most favorable to the Rawsons, the documents signed by the Rawsons effectively excluded any such warranties. The K & K sales agreement signed by James Rawson stated in bold type: "**NO WARRANTIES, EXPRESS OR IMPLIED … ARE MADE BY K & K WITH RESPECT TO THE USED MOTOR VEHICLE … EXCEPT AS MAY BE EXPRESSED IN WRITING BY K & K FOR SUCH USED MOTOR VEHICLE. WHICH WARRANTY, IF SO EXPRESSED IN WRITING IS INCORPORATED HEREIN AND MADE A PART HEREOF**." The sales agreement further stated: "No agreement, verbal or otherwise, not contained in writing in this agreement on this document will be recognized." Finally, written on the top of the Buyer's Guide signed by James Rawson was the statement "IMPORTANT: Spoken promises are difficult to enforce. Ask the dealer to put all promises in writing." The Rawsons did not request that Clark's oral statements be incorporated into the final expression of their agreement, and therefore, the statements were excluded from the agreement. There were no express warranties as part of the sales agreement, and the court of appeals correctly affirmed Judge Iwasaki's grant of summary judgment.

## CONCLUSION

¶ 59 We hold that the court of appeals was correct in affirming Judge Brian's and Judge Iwasaki's grants of summary judgment.

¶ 60 Chief Justice HOWE, Justice DURHAM, Justice DURRANT, and Justice WILKINS concur in Associate Justice RUSSON's opinion.