**PHOENIX INDEMNITY INSURANCE COMPANY, Plaintiff and Appellant,**

v.

**Estate of Justin BELL, Deceased, by and through his Special Administrator, Defendant and Appellee.**

**No. 940151–CA.**

Court of Appeals of Utah.

May 18, 1995.

---

Wendell E. Bennett (argued), Jeannine Bennett, Wendell E. Bennett & Associates, Salt Lake City, for appellant.

Stuart H. Schultz (argued), Catherine M. Larson, Strong & Hanni, Salt Lake City, for appellee.

Before ORME, GARFF[1] and WILKINS, JJ.

## OPINION

ORME, Presiding Judge:

Plaintiff Phoenix Indemnity Insurance Company appeals the trial court's order granting summary judgment in favor of the estate of Justin Bell. Specifically, the court held that, at the time of his death, Bell was covered by a valid automobile insurance policy issued by Phoenix. We affirm.

## FACTS

The facts are not in dispute. On July 10, 1991, Justin Bell applied for an automobile insurance policy with Phoenix Indemnity Insurance Company through Lyons & Associates, an independent insurance agency. The policy, covering his 1980 Saab, included liability and personal injury coverage as required by the Motor Vehicle Code, Utah Code Ann. § 31A–22–302 (1991), as well as provisions for collision and other car damage. Along with his signed application,[2] Bell submitted

---

1. Senior Judge Regnal W. Garff, acting pursuant to appointment under Rule 3–108(4), Utah Code of Judicial Administration.

2. The paragraph above the signature line stated, in part, as follows:

    I understand that no coverage is bound earlier than the time and date the application is

the required premium check for $164, drawn on Zions First National Bank and made payable to Phoenix. Lyons sent the application and check to Phoenix's office in Phoenix, Arizona. Phoenix processed the application and deposited the check with M & I Thunderbird Bank on July 15. As payor bank, Zions received the check on July 18, but was not able to withdraw funds from Bell's account to pay the $164 because the account balance was $112.24.[3] Accordingly, Zions stamped the check "not paid, refer to maker," and returned the check to M & I Thunderbird on July 19. On July 25, M & I Thunderbird posted the check as a returned item and mailed notice to Phoenix that Zions had returned the check unpaid.

On July 29, Phoenix received M & I Thunderbird's notice of the returned check. On the same day, it issued the written insurance policy for the coverage for which Bell had applied. The policy's declarations page, summarizing the coverage and other details of the insurance arrangement, was countersigned by a Phoenix representative on August 1. On August 7, Phoenix mailed a notice to Bell cancelling insurance coverage retroactive to July 10, the date of application.[4] On the notice of cancellation, Phoenix indicated that the reason for cancellation was "NSF check-not honored by bank."

Meanwhile, Bell drove the Saab to California on August 8; was involved in an automobile accident on August 11 in Norwalk, California; and subsequently died as a result of injuries sustained in the accident. Pursuant to the coverage under the terms of the policy issued July 29, Bell's heirs filed multiple claims with Phoenix. However, Phoenix maintained that no insurance coverage was in force for Bell or his Saab on August 11, and subsequently commenced this action seeking a declaratory judgment to that effect.

Two years after the fatal accident, Bell's estate and Phoenix filed cross motions for summary judgment.[5] After a hearing to consider both motions, the trial court denied Phoenix's motion and granted Bell's motion. The trial court concluded that insurance coverage was in force on August 11, 1991, because (1) Phoenix issued Bell a valid policy for insurance on July 29 notwithstanding Bell's dishonored check, and (2) the notice of cancellation mailed by Phoenix on August 7 failed to give Bell the ten-day advance notice required by Utah Code Ann. § 31A–21–303(2)(c) (Supp.1994).

## ISSUES

In support of its position that no insurance coverage existed on August 11, 1991, Phoenix offers three arguments: (1) its acceptance of Bell's check as payment was conditioned upon it being honored by the payee bank; (2) a worthless check for the first premium of an insurance policy does not satisfy the basic requirement of consideration for the contract; and (3) because the contract failed for lack of consideration, there was no policy in existence to be cancelled, making it inconse-

---

signed.... I also agree that if my premium payment is not honored by the bank, no coverage will be considered bound. I hereby acknowledge that I received a copy of this application.

3. According to bank records, there were sufficient funds in Bell's account to cover the $164 check on July 12, 15, 22, 23, 26, 29, 31 and August 1. Phoenix never resubmitted the check for payment.

4. The Utah Insurance Code provides the conditions under which an insurance policy may be cancelled, and imposes minimum time periods between the notice and the effective date of the cancellation. With respect to new policies in effect for less than 60 days, the applicable subsection states, in part, as follows:

No cancellation ... is effective until at least *ten days after the delivery* to the insured of a written notice of cancellation. If the notice is sent by first class mail, postage prepaid, to the insured at his last known address, delivery is considered accomplished after the passing, since the mailing date, of the mailing time specified in the Utah Rules of Civil Procedure. Utah Code Ann. § 31A–21–303(2)(c) (Supp.1994) (emphasis added).

It is undisputed that the notice of cancellation mailed August 7 did not comply with section 31A–21–303(2)(c), insofar as it purported to cancel the policy on a date earlier than ten days after delivery of the cancellation notice.

5. After almost a year of inaction following Bell's answer to Phoenix's complaint, the trial court issued an order to show cause why the case should not be dismissed for failure to prosecute. As a result, both parties agreed to move the case forward within 90 days.

quential that the purported cancellation was not in accordance with Utah Code Ann. § 31A–21–303(2)(c) (Supp.1994).

## STANDARD OF REVIEW

"A trial court should grant summary judgment only when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law." *Russell v. Thomson Newspapers, Inc.*, 842 P.2d 896, 898 (Utah 1992). *Accord* Utah R.Civ.P. 56(c); *Western Farm Credit Bank v. Pratt*, 860 P.2d 376, 377 (Utah App.1993), *cert. denied*, 879 P.2d 266 (Utah 1994). We review the decision to grant summary judgment "for correctness, according no deference to the trial court's legal conclusions." *Christensen v. Swenson*, 874 P.2d 125, 127 (Utah 1994). We now turn to an examination of the law relevant to our analysis.

## INSURANCE LAW

■ Insurance policies are contracts and are interpreted under the same general rules applicable to other contracts. *Gee v. Utah State Retirement Bd.*, 842 P.2d 919, 920 (Utah App.1992). However, "[a]ll ambiguities [in an insurance contract] are construed against the insurer and are 'resolved in favor of coverage.'" *Hill v. Farmers Ins. Exch.*, 888 P.2d 138, 140 (Utah App.1994) (quoting *Nielsen v. O'Reilly*, 848 P.2d 664, 666 (Utah 1992)). Likewise, the terms and conditions of a policy are strictly construed in favor of the insured. *Baumgart v. Utah Farm Bureau Ins. Co.*, 851 P.2d 647, 651 (Utah App.), *cert. denied*, 862 P.2d 1356 (Utah 1993). Such sound public policy seeks to equalize the disparate positions of the insured and the insurer. An insurance company has control over the terms of the contract, as well as industry knowledge and experience far superior to that of the typical individual seeking insurance coverage.

■ In addition, the Legislature has seen fit, through the Utah Insurance Code, to regulate the manner in which insurers conduct business. *See* Utah Code Ann. §§ 31A–1–101 to –31–108 (1991 & Supp.1994). Under the provisions of the Insurance Code regulating the termination of existing policies, an insurer must give advance notice to its insured, varying from ten to thirty days depending on the circumstances, before the cancellation of an existing insurance policy becomes effective. Utah Code Ann. § 31A–21–303(2)(b), (c) (Supp.1994).[6] *See* 14A John A. Appleman & Jean Appleman, *Insurance Law and Practice* § 8162, at 212 (1985) (cancellation ineffective if statutory notice requirement not complied with). Such advance notice gives an insured time to make other arrangements so that he or she will not be left without coverage. In particular, factors pertaining to the cancellation of automobile insurance should weigh very heavily in favor of the insured. The Utah Motor Vehicle Code requires an owner or operator of a motor vehicle to have insurance or other accepted proof of security. Utah Code Ann. § 41–12a–301(2), –303, –303.2 (1993 & Supp. 1994). Thus, there is a compelling need for advance notice of cancellation of an existing policy so that the insured motorist is able to secure coverage after the cancellation date, not only for his or her own protection, but also for that of the traveling public.

Utah law recognizes the long-established industry practice of providing temporary insurance coverage that is effective while the insurer is processing the insured's application. As noted by the trial court, "binder" is a term of art in the insurance industry for a

---

**6.** Section 31A–21–303(2) states, in part:

(b) Not sooner than 30 days after the delivery or first class mailing of a written notice to the policyholder, the cancellation provided by Subsection (2)(a), except cancellation for nonpayment of premium, is effective. Cancellation for nonpayment of premium is effective no sooner than ten days after delivery or first class mailing....

(c) Subsections (2)(a) and (b) do not apply to any insurance contract that has not been previously renewed if the contract has been in effect less than 60 days when the notice of cancellation is mailed or delivered. No cancellation under this subsection is effective until at least ten days after the delivery to the insured of a written notice of cancellation. If the notice is sent by first class mail, postage prepaid, to the insured at his last known address, delivery is considered accomplished after the passing, since the mailing date, of the mailing time specified in the Utah Rules of Civil Procedure. Utah Code Ann. § 31A–21–303(2)(b), (c) (Supp. 1994).

temporary contract for insurance, established by the application for insurance and payment of the first premium, and effective only until the policy is issued. *See Long v. United Benefit Life Ins. Co.,* 29 Utah 2d 204, 210, 507 P.2d 375, 379 (1973); *Stevenson v. First Colony Life Ins. Co.,* 827 P.2d 973, 977–78 (Utah App.), *cert. denied,* 843 P.2d 1042 (Utah 1992); *Payne v. Old Hickory Ins. Co.,* 532 So.2d 956, 958 n. 1 (La.App.1988); 12A John A. Appleman & Jean Appleman, *Insurance Law and Practice* § 7227, at 146 (1981); 2 Mark S. Rhodes, *Couch Cyclopedia of Insurance Law* § 14:26 (rev. ed. 1984). In *Stevenson,* this court held that a signed application and premium check create temporary insurance coverage that is effective only until the insurer either rejects the application or issues the policy.[7] 827 P.2d at 978.

## ANALYSIS

The trial court concluded that *two different* contractual relationships existed between the parties: a contract for temporary insurance coverage or binder, effective until Phoenix issued the formal policy and controlled by the terms of the application signed by Bell on July 10, and the final contract of insurance, controlled by the terms of the formal policy issued by Phoenix on July 29. We agree.

### 1. The Application

The submitted application, while intended to give Bell temporary insurance coverage, contained a specific condition precedent which must have been satisfied in order to have formed a valid contract for insurance. According to its terms, the applicant agreed that "if my premium payment is not honored by the bank, no coverage will be considered bound." "Bound," whether an unambiguous term or an ambiguous term construed in

favor of the insured, refers to the binder of temporary insurance. Once Phoenix issued its formal policy on July 29, the contractual terms of the application were superseded by the terms of the policy itself. Therefore, the trial court correctly concluded that the terms of the application that conditioned coverage upon a properly honored check for the premium applied only to the binder contract for temporary coverage and not to the contract memorialized in the policy.[8]

### 2. The Policy

Phoenix contends that the insurance contract, as represented by the terms of the July 29 policy, never came into existence because Bell's dishonored check did not satisfy the requirement, referred to by Phoenix as a condition precedent, of consideration for the contract. We disagree.

While Phoenix correctly states the general rule of law regarding the conditional nature of payment of the initial premium by check, this rule may be changed "by the express or implied intentions of the parties." *Cullotta v. Kemper Corp.,* 78 Ill.2d 25, 34 Ill.Dec. 306, 308, 397 N.E.2d 1372, 1374 (1979). *See* 6 Mark S. Rhodes, *Couch Cyclopedia of Insurance Law* § 31:45 (rev. ed. 1985). Thus, under certain circumstances, a check may be considered proper consideration for an insurance contract even though subsequently dishonored by the payee bank. *Cullotta,* 34 Ill.Dec. at 308, 397 N.E.2d at 1374; 14A John A. Appleman & Jean Appleman, *Insurance Law and Practice* § 8144, at 189 (1985). In the instant case, there are circumstances that compel such a conclusion.

Phoenix, although claiming that no contract existed for lack of consideration, chose a course of action that indicates it had accepted Bell's check as consideration[9] and

---

7. The *Stevenson* court went on to say that a contract for temporary insurance is "terminated when the application is rejected and the applicant is given adequate notice of that rejection." *Stevenson v. First Colony Life Ins. Co.,* 827 P.2d 973, 978 (Utah App.), *cert. denied,* 843 P.2d 1042 (Utah 1992). The court determined notice to be insufficient when the insurance agency notified the applicant's wife by telephone that the insurer had declined the application. *Id.* at 979.

8. The trial court also concluded, for what it was worth, that no coverage existed under the binder because Bell failed to satisfy this condition.

9. A check, in addition to constituting an instruction to the maker's bank to pay funds from a particular account, represents the maker's promise to pay. Utah Code Ann. § 70A–3–104(1), (6) (Supp.1994). A promise to pay is adequate consideration to support a contract. *See Copper State Leasing Co. v. Blacker Appliance & Furni-*

regarded the insurance contract as complete. It issued the policy on July 29 even though it had notice of the dishonored check.[10]

Significantly, three days later an authorized agent of Phoenix countersigned the policy, thereby indicating its acceptance of the application and final validation of the policy's effectiveness. *See, e.g., Armotek Indus., Inc. v. Employers Ins.,* 952 F.2d 756, 760 (3d Cir.1991); *Bituminous Casualty Corp. v. Aetna Ins. Co.,* 461 F.2d 730, 732 (8th Cir. 1972); *Webster v. State Farm Mut. Auto. Ins. Co.,* 54 Wash.App. 492, 774 P.2d 50, 52 (1989); 12 Appleman, *supra,* § 7133, at 507; 1 Rhodes, *supra,* § 8:14. Typically, insurers use countersignature as a means of authentication that indicates full and final execution of the insurance contract. 12 Appleman, *supra,* § 7133, at 507. In *Webster,* the court stated that it is "the issuance of a policy that renders it effective, i.e., when the policy is signed and executed by officials of the insurer." 774 P.2d at 52. Thus, in the instant case Phoenix countersigned the policy *after* receiving notification of the dishonored check, an outward manifestation of its commitment to insure Bell according to the terms of the policy, notwithstanding the status of his check.

Finally, the cancellation notice, entitled "Notice of Cancellation or Non–Renewal," evidenced Phoenix's recognition that the policy was in effect. By utilizing that particular notice, Phoenix was cancelling an existing policy rather than rejecting Bell's application.[11]

■ Furthermore, the policy, unlike the application, lacked specific language that made actual payment a condition precedent to insurance coverage. *See Oaks v. Motors Ins. Corp.,* 595 P.2d 789, 791 (Okla.1979) (non-specific language failed to make prepayment of premium a condition precedent to

validity of policy). The policy stated, in part, "We agree with you, in return for your premium payment, to insure you subject to all the terms of this policy." This language does not establish a condition precedent that requires the insured to pay the premium *prior to* receiving insurance coverage. Stated another way, when construed against the insurer, the term "in return" means "in exchange," rather than "upon receipt of cash funds," and thus presumes that satisfactory payment has already been received rather than that it is yet forthcoming.

Accordingly, we hold that Bell was insured under the policy issued by Phoenix on July 29 and that this policy was governed by the termination provisions of Utah Code Ann. § 31A–21–303(2)(c) (Supp.1994). Under section 303(2)(c), cancellation of Bell's policy cannot take effect until at least ten days after delivery of the notice. Because the notice was mailed on August 7 and the accident occurred on August 11, the ten-day period had not yet run and the policy was still in force at the time of the accident.

## CONCLUSION

The trial court correctly granted summary judgment in favor of Bell. Although Bell's check for the first premium was subsequently dishonored upon initial presentment, Phoenix issued an insurance policy that was in effect at the time of Bell's accident August 11, 1991. Affirmed.

GARFF and WILKINS, JJ., concur.

---

ture Co., 770 P.2d 88, 91 (Utah 1988); 1 Arthur L. Corbin, *Corbin on Contracts* § 121, at 517 (1963).

**10.** Phoenix's protest that two different departments were involved is unavailing—its particular approach to management and in-house communication has no legal significance. Further, the policy was countersigned by a Phoenix representative on August 1, three days after issuance,

which obviates any concern about a crossed-in-the-interoffice-mail situation.

**11.** We are unpersuaded by Phoenix's claim that it was merely using a pre-printed form for its notice to Bell. Phoenix controls the accuracy of the documents it issues and cannot now claim, in effect, "we did not really mean what we said on the form we prepared and sent." *See supra* note 10.