2008 UT App 315

ASAEL FARR & SONS COMPANY, a corporation, Plaintiff and Appellant,

v.

TRUCK INSURANCE EXCHANGE, a Reciprocal or Inter–Insurance Exchange; Andrew L. Reed; Trustco, Inc., a corporation; Safeco Insurance Company, a corporation; American States Insurance Co., a corporation; Hartford Steam Boiler Inspection and Insurance Co., a corporation; Stephen D. Kirchen; Central Bonds & Insurance Agency, Inc.; Central Bonds and Insurance Company Incorporated, a corporation; Auto–Owners Insurance Company, a corporation; Blackburn Jones Company, a corporation; E. Kent Jones; Trinity Universal Insurance Company of Kansas, Inc., a corporation; Trinity Universal Insurance Co., a corporation; and Unitrin Property & Casualty Insurance Group, a corporation or common enterprise, Defendants and Appellees.

No. 20070518–CA.

Court of Appeals of Utah.

Aug. 28, 2008.

Brett D. Cragun, Anthony R. Martineau, and Ray G. Martineau, Salt Lake City, for Appellant.

Aaron Alma Nelson, Clifford J. Payne, and Michael D. Lichfield, Salt Lake City, for Appellees Truck Insurance Exchange and Andrew L. Reed.

Michael F. Skolnick and Gary T. Wight, Salt Lake City, for Appellee Trustco, Inc.

Jonathan Hawkins, Salt Lake City, for Appellees Safeco Insurance Company and American States Insurance Co.

Scott G. Johnson and Emily P. Hennen, Minneapolis, Minnesota, for Appellee Hartford Steam Boiler Inspection and Insurance Co.

Craig R. Mariger and Bruce Wycoff, Salt Lake City, for Appellees Stephen D. Kirchen, Central Bonds & Insurance Agency, Inc., and Central Bonds and Insurance Company Incorporated.

Lowell V. Smith and Eric K. Davenport, Sandy, for Appellee Auto–Owners Insurance Company.

Kevin S. Gardner, Salt Lake City, for Appellee Blackburn Jones Company.

Trent J. Waddoups, Salt Lake City, for Appellees Trinity Universal Insurance Company of Kansas, Inc., Trinity Universal Insurance Co., and Unitrin Property & Casualty Insurance Group.

Before THORNE, Associate P.J., DAVIS, and McHUGH, JJ.

## OPINION

McHUGH, Judge:

¶ 1 Appellant Asael Farr & Sons Company (Farr) appeals the trial court's denial of Farr's motion for partial summary judgment against Safeco Insurance Co. (Safeco), American States Insurance Co. (American States), Hartford Steam Boiler Inspection and Insurance Co. (Hartford), Trustco, Inc. (Trustco), and Andrew L. Reed; and the court's grant of summary judgment in favor of Appellees Reed, Trustco, Safeco, Hartford, Stephen D. Kirchen, Central Bonds & Insurance Agency, Inc. (Central Bonds),[1] and Auto–Owners Insurance Co. (Auto–Owners). We affirm.

1. Farr also named Central Bonds and Insurance Company Inc.—an entity distinct from Appellee Central Bonds—as a defendant in its third amended complaint. The trial court ruled that Central Bonds and Insurance Company, Inc. had no involvement in the events leading to this dispute and granted it summary judgment. Farr does not appeal that ruling.

2. Although a quote was sought from Safeco, the policy was actually underwritten by a Safeco affiliate, American States. Because the record is unclear as to exactly what role each entity had during the negotiations leading up to the issuance of the policy, we refer to them collectively as American States/Safeco.

## BACKGROUND

¶ 2 Formed in 1920, Farr is a closely held corporation engaged in the production, retail, and distribution of ice cream products. This case arises out of a dispute over the insurance coverage for inventory spoiled by an ammonia release caused by an equipment breakdown at Farr's cold storage facility. Farr claims losses of over $1.5 million, an amount greatly exceeding the $25,000 recovery limit contained in a policy that was issued by American States/Safeco shortly after the loss.[2] Farr brought this action against various insurers, reinsurers, and insurance agents to recover the losses for which it has not yet been compensated.[3]

¶ 3 During the year prior to the spoilage incident, Trinity Universal Insurance Company of Kansas, Inc. and Trinity Universal Insurance Co. (collectively, Trinity), a subsidiary of Unitrin Property & Casualty Insurance Group (Unitrin), provided commercial insurance to Farr.[4] According to Farr, Trinity's policy (the Trinity policy) included, among other things, property and liability coverage. On March 31, 2003, Trinity notified Farr of its decision not to renew the policy, which would expire on May 13, 2003. Dexter Duane Farr (Dexter Farr), Farr's general manager and chairman of the board, has been responsible for Farr's insurance coverage for twenty-five to thirty years. In connection with his efforts to obtain replacement insurance coverage, Dexter Farr met with Reed, a licensed insurance agent who was already providing workers' compensation coverage for Farr. Reed hoped to secure all of Farr's insurance-related business.

3. There is no dispute that Farr has been paid the $25,000 specified in the American States/Safeco policy.

4. Farr did not initially assert any claims against Trinity or Unitrin but joined them in the lawsuit after other defendants filed notice of their intent to seek apportionment of fault against Blackburn–Jones Company and E. Kent Jones (collectively, Blackburn–Jones), Trinity, and Unitrin. On appeal, Farr does not contest the trial court's grant of summary judgment in favor of Blackburn–Jones, Trinity, and Unitrin. Nevertheless, Trinity and Unitrin have filed briefs in this appeal, raising issues that might have become relevant in the event of remand.

¶ 4 Reed was a captive agent of Truckers Insurance Exchange (TIE), also referred to by the parties as Farmers Insurance Group (Farmers).[5] As a captive agent, Reed was first required to offer any insurance opportunities to TIE/Farmers. If TIE/Farmers wrote the policy, Reed would be entitled to a commission fee. In contrast, if TIE/Farmers declined coverage, Reed was free to seek coverage from another insurer. TIE/Farmers declined to issue a bid for Farr's property and general liability coverage but did agree to provide automobile and workers' compensation insurance. Consequently, Reed continued his efforts to find replacement property and general liability insurance before the May 13, 2003 expiration of Farr's policy with Trinity.

¶ 5 In early to mid-March 2003, Reed first contacted Kirchen, an insurance agent licensed by the State of Utah to sell property, casualty, and life insurance. Kirchen was employed as an agent for Central Bonds. As part of his efforts to find property and liability coverage for Farr, Kirchen used an automated rating system at Central Bonds' office that allowed him to input data and obtain pricing information for Auto–Owners' policies. Neither Central Bonds nor Kirchen had the authority to bind an Auto–Owners policy.[6] Although the Auto–Owners regional underwriter was "comfortable" with the pricing generated by the in-house rating system for Farr, he indicated that coverage "was subject to receiving [Kirchen's] quote, [Kirchen's] applications, the loss history . . . , property valuation and [Auto–Owners'] *home office approval.*" (Emphasis added.) Obtaining a policy from Auto–Owners was fur-

ther complicated by the fact that it could not quote spoilage or equipment coverage for Farr because of a pre-existing reinsurance agreement with Travelers Indemnity Company/Travelers Boiler Express (Travelers).[7] Therefore, Kirchen requested a separate quotation[8] for the spoilage coverage from Travelers.[9] Kirchen did not receive a decision from Auto–Owners' home office prior to the submission of quotes to Farr.

¶ 6 Simultaneous with the expiration of the Trinity policy on May 13, 2003, Farr received bids for its property and liability insurance from several agents, including a bid from Auto–Owners that was prepared by Kirchen/Central Bonds. One day later, Farr also received an oral bid from Blackburn–Jones for a policy to be underwritten by Safeco. Ultimately, Dexter Farr selected the Auto–Owners quote, and on May 14, 2003, Farr delivered a check payable to Auto–Owners to Reed. Several days after the May 13 deadline, Kirchen learned that Auto–Owners' home office had declined coverage. Kirchen immediately relayed that information to Reed and returned Farr's uncashed check.

¶ 7 When Auto–Owners declined coverage, Kirchen and Reed discussed the possibility of having a friendly agent resubmit the Safeco bid that had been presented orally on May 14 by Blackburn–Jones. Kirchen and Central Bonds did not represent Safeco and therefore could not present the quote to Farr. As a courtesy, Kirchen contacted Troy Granger, one of the principals of Trustco, to see if he was interested in presenting the Safeco bid. Granger understood that because the entire

---

**5.** Farr does not assert any claims against TIE or Farmers on appeal. *See Holmes Dev., LLC v. Cook,* 2002 UT 38, ¶¶ 54–55, 48 P.3d 895 (declining to address issues that a party failed to address, and therefore waived, on appeal).

**6.** Although Farr disputed this fact in the trial court, it did not provide any evidence that could support a contrary finding. The only allegedly conflicting evidence relied upon by Farr is the deposition testimony of Reed. Yet Reed stated only that he did not know whether or not Central Bonds had authority to bind coverage for Auto–Owners. Furthermore, Kirchen testified that he could not bind coverage for Auto–Owners, and Reed testified that he had no factual basis to dispute Kirchen's testimony on that point.

**7.** Farr attempted to add Travelers as a defendant in its fourth amended complaint. The trial court denied Farr's motion to amend, and Farr has not appealed that decision.

**8.** The Travelers' quote contained a "Spoilage Damage" coverage limit of $100,000 and a separate, express limitation for "Ammonia Contamination" of $25,000.

**9.** Kirchen obtained this separate quotation from Travelers because Auto–Owners could not provide coverage for the Salt Lake location; only "the Ogden locations were taken care of."

account had been previously quoted with Safeco, all that was required was to obtain a letter from Farr appointing Trustco as its broker of record (BOR). Granger believed that the main emphasis was to get coverage bound that day—May 23, 2003. Granger faxed the BOR letter signed by Dexter Farr to American States/Safeco's underwriter, and Trustco was appointed the agent for the quotes previously presented by Blackburn–Jones. Granger's notes of the May 23, 2003 conversation state, in part:

> We did [a] BOR letter & I talked to Chatrice[, American States/Safeco's underwriter]. She confirmed she got it. I asked her about coverage being bound & she said it was. I told her to go with all coverages except auto as they had gone to Farmers w/auto. There was also a little hesitation on her part when I inquired about the waiving of the 10 days notice to [the] other agent[, Blackburn–Jones]. She said she was not sure. I [pleaded] my case but did not get a firm answer.

It was Granger's understanding that the Blackburn–Jones quote was complete.[10]

¶ 8 Several days later, on May 27, 2003, American States/Safeco notified Granger that the Blackburn–Jones quote was not complete and that Trustco would have to submit an application for the coverages desired for Farr.[11] Granger faxed that application to Terry Dalton of American States/Safeco on May 28, 2003, but he indicated, "I am working on [the] umbrella & equip breakdown apps & will get them to you A.S.A.P.!" American States/Safeco had a reinsurance treaty with Hartford, whereby Hartford provided the spoilage coverage for American States/Safeco policies. During business hours on May 29, 2003, Granger faxed American States/Safeco the umbrella and equipment breakdown applications, which included a limit of $25,000 for spoilage.[12] Sometime that same night, there was an ammonia leak at Farr's Salt Lake cold storage facility, resulting in the spoilage of inventory and the losses Farr seeks to recover in this action. The American States/Safeco policy was prepared on June 4, 2003, and delivered to Farr on June 20, 2003. That policy contains a $25,000 limit for spoilage. According to Dexter Farr, it was not until one or two weeks after the incident—or possibly when he received the American States/Safeco policy almost a month after the incident—that he learned of that policy's $25,000 limit for inventory loss due to spoilage.

¶ 9 In this lawsuit, Farr has amended its original complaint three times. Farr's third amended complaint named Reed, as well as TIE, Trustco, Safeco, American States, Hartford, Kirchen, Central Bonds, and Auto–Owners as "Primary Defendants," which includes fewer than all defendants in the trial court and most, but not all, of the Appellees here. Farr later filed a Motion for Leave to File Fourth Amended Complaint, seeking to join Travelers as a party.[13] The trial court denied Farr's fourth motion to amend, ruling that "Farr's Third Amended Complaint shall be the operative complaint for consideration of all remaining motions." Limiting itself to the claims properly raised in the third amended complaint, the trial court then denied Farr's motion for summary judgment and granted the cross motions of each of the defendants. The trial court refused to address "Farr's 'new' claims involving allegations of an oral binder and policy ambiguity." Farr now appeals the trial court's summary judgment rulings, arguing, in part, that the breach of contract claim detailed in its third

10. Like the other bids presented, the Blackburn–Jones quote was prepared in response to Dexter Farr's instruction that he wanted an apples-to-apples comparison with the existing Trinity policy. The Trinity policy contained a $25,000 coverage limit for spoilage due to equipment breakdown.

11. Terry Dalton, American States/Safeco's territorial manager, requested a supplemental application for equipment breakdown, stating that the coverage for these had not been requested in the Blackburn–Jones submission.

12. Granger testified that Reed provided him with a copy of the application Kirchen of Central Bonds had prepared, and they simply filled in the same information in the application for American States/Safeco.

13. With the exception of the addition of Travelers as a defendant, the fourth amended complaint is virtually identical to the third amended complaint.

amended complaint sufficiently raised the theories of policy ambiguity and oral binder.

## ISSUE AND STANDARD OF REVIEW

¶ 10 Farr argues on appeal that the trial court erred in granting summary judgment in favor of Appellees on its claims of breach of contract, negligence, breach of the covenant of good faith and fair dealing, and estoppel.

¶ 11 We "review[ ] a trial court's legal conclusions and ultimate grant or denial of summary judgment for correctness, and view[ ] the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Orvis v. Johnson,* 2008 UT 2, ¶ 6, 177 P.3d 600 (citation and internal quotation marks omitted). The trial court is accorded "no deference to [its] resolution of the legal issues presented[,] and [we] determine only whether the trial court erred in applying the governing law and whether the trial court correctly held that there were no disputed issues of material fact." *Ervin v. Lowe's Cos.,* 2005 UT App 463, ¶ 8, 128 P.3d 11 (internal quotation marks omitted).

¶ 12 Farr carried the burden of establishing each of its claims. *See Orvis,* 2008 UT 2, ¶ 9, 177 P.3d 600 (noting that the party asserting estoppel had the burden of proof); *Brown v. Moore,* 973 P.2d 950, 953–56 (Utah 1998) (upholding grant of summary judgment where the plaintiffs did not present evidence supporting their claim for breach of the covenant of good faith and fair dealing); *Nelson v. Salt Lake City,* 919 P.2d 568, 574 (Utah 1996) ("On . . . issues essential to the cause of action for negligence, the plaintiff, in general, has the burden of proof." (internal quotation marks omitted)); *John Call Eng., Inc. v. Manti City Corp.,* 795 P.2d 678, 680 (Utah Ct.App.1990) ("The plaintiff has the burden of showing the contract breach and his dam-

ages . . . ." (internal quotation marks omitted)). Accordingly, Farr was required to respond to the defendants' summary judgment motions by " 'set[ting] forth specific facts showing that there [were] . . . genuine issue[s] for trial' " with respect to the challenged elements of its claims. *Orvis,* 2008 UT 2, ¶¶ 10–18, 177 P.3d 600 (quoting Utah R. Civ. P. 56(e)).

## ANALYSIS

### I. Farr's Oral Binder and Policy Ambiguity Claims

¶ 13 Farr claims that its theories of oral binder [14] and policy ambiguity [15] were sufficiently raised by its third amended complaint. Because the identification of the claims at issue is a necessary prerequisite to any assessment of the trial court's summary judgment decision, we address this issue first.

¶ 14 Although the trial court acknowledged that the third amended complaint does contain breach of contract claims, the trial court ruled that such claims "w[ere] not predicated either upon" oral binder or policy ambiguity and, therefore, "any claim that [Appellees] assumed and breached additional contractual duties to [Farr] was waived." According to Farr, its claim of oral binder was "fully briefed and presented to the trial court" in the third amended complaint, particularly by paragraph 21, which states:

On and before May 14, 2003, Reed, while acting both for himself and as the duly authorized agent for TIE, Trustco, Safeco, American [States], Hartford, Kirchen, Central Agency, Central Bonds and Auto–Owners ("Primary Defendants"), had received payment for and affirmatively represented to plaintiff (a) that the Primary Defendants had duly bound and provided plaintiff with all necessary and appropriate

---

**14.** A " 'binder' . . . [is] a temporary contract for insurance, established by the application for insurance and payment of the first premium, and effective only until the policy is issued." *Phoenix Indem. Ins. Co. v. Estate of Bell,* 896 P.2d 32, 35–36 (Utah Ct.App.1995). Farr concedes that none of Appellees issued a written binder and argues that only an oral contract of insurance existed as to Auto–Owners through Kirchen and Central Bonds.

**15.** Farr makes no argument on appeal that any specific provision of the policy is ambiguous and points to nowhere in his third amended complaint where he asserted a claim of policy ambiguity. Therefore, we do not address the policy ambiguity issue further.

insurance coverage for all of plaintiff's significant insurable risks, including all insurable risks related to Plaintiff's Products, and (b) that the Primary Defendants, and each, of them had agreed, committed, and became jointly obligated to provide plaintiff with all such necessary, available and appropriate insurance coverage for all of Plaintiff's Products and all of plaintiff's significant insurable risks ("Reed's Commitment"), effective May 14, 2003.

¶ 15 Despite Farr's contentions to the contrary, a careful reading of the third amended complaint reveals claims against a myriad of defendants arising as the result of the purported commitment of Reed to (1) investigate and accurately determine all of Farr's insurable risks, (2) advise Farr of the insurance coverage available to cover those risks and its cost, and (3) ensure that Farr was covered for all such risks or obtain written confirmation that Farr had determined not to avail itself of available coverage (collectively, Reed's Commitment). Reed purportedly made this commitment to Dexter Farr well before many of Appellees had any involvement in the efforts to obtain property and liability insurance for Farr.

¶ 16 The third amended complaint asserts that as a result of Reed's Commitment, Farr "was reasonably [led] to believe that it did not need to read any insurance policies it was provided with, or to have an insurance expert read and interpret any such insurance policy for [Farr]." Furthermore, Farr alleges that the policy American States/Safeco eventually issued was a "partial, but negligent, erroneous, and untimely fulfillment of Reed's Commitment." The Primary Defendants are alleged to have failed to fulfill the affirmative duties created by Reed's Commitment in a number of respects, including failing to "assure that [Farr] was provided, with appropriate coverage." Farr also alleges that the Primary Defendants were "obligated under Reed's Commitment to have provided [Farr] with the insurance coverage necessary to reimburse it for all of the damages [Farr]

has suffered" due to the loss.[16] The premise of the claims in the third amended complaint is that Farr was underinsured when it suffered the losses associated with the ammonia leak and that each Appellee violated some legal responsibility to ensure that Farr was adequately covered.

¶ 17 "A plaintiff is required, under our liberal standard of notice pleading, to submit a 'short and plain statement ... showing that the pleader is entitled to relief' and 'a demand for judgment for the relief.'" *Canfield v. Layton City*, 2005 UT 60, ¶ 14, 122 P.3d 622 (omission in original) (quoting Utah R. Civ. P. 8(a)(1)-(2)). Although "[t]he plaintiff must only give the defendant 'fair notice of the nature and basis or grounds of the claim and a general indication of the type of litigation involved,'" *id.* (quoting *Williams v. State Farm Ins. Co.*, 656 P.2d 966, 971 (Utah 1982)), it must do at least that much, *see Harper v. Evans*, 2008 UT App 165, ¶ 13, 185 P.3d 573 ("[T]he [plaintiffs'] amended complaint alleges only that [the d]efendants negligently performed the November 2002 surgeries and nothing more. These allegations, standing alone, do not state a claim for relief for continuous negligent treatment, even under Utah's liberal notice pleading requirements." (citation and internal quotation marks omitted)).

¶ 18 Nowhere in the third amended complaint, or in the three complaints that preceded it,[17] does Farr allege that any of the defendants had actually bound adequate coverage but refused to pay the amounts due under that orally bound policy. Rather, Farr's claims, which all arise out of its contention that the defendants failed to ensure that Farr was covered for all of its significant risks, are directly contrary to such a position. And we see nothing in the complaint to suggest that Farr intended to assert the existence of adequate coverage as an alternative theory. Consequently, the third amended complaint does not give Appellees fair notice of the nature and basis of the oral binder

---

16. The complaint also contends that after the loss, Appellees failed to fairly evaluate and promptly pay Farr's claim, thereby willfully disregarding the obligation to act in good faith.

17. Even the rejected fourth amended complaint is devoid of any allegations that insurance coverage for an amount in excess of $25,000 was orally bound by any of the defendants.

theory and was therefore not properly before the court at the time of summary judgment.

¶ 19 Farr's oral binder claim was first raised, after approximately three years of discovery, in Farr's memorandum in opposition to Hartford's motion for summary judgment.[18] Rejecting this tactic, the Utah Supreme Court explained: "A plaintiff cannot amend the complaint by raising novel claims or theories for recovery in a memorandum in opposition to a motion to dismiss or for summary judgment because such amendment fails to satisfy Utah's pleading requirements." *See Holmes Dev., LLC v. Cook,* 2002 UT 38, ¶ 31, 48 P.3d 895 (citations omitted). We hold that the trial court properly refused to consider Farr's oral binder claims in its summary judgment rulings, and we do not address them further.

## II. Summary Judgment Motions

### A. Reed

#### 1. Breach of Contract

¶ 20 Farr claims that the facts, when viewed in a light most favorable to Farr, establish that "Reed made representations that [he] would provide Farr with appropriate insurance coverage and Farr relied on those representation[s] to its detriment." Farr further argues that Reed breached his contractual obligations to Farr because limitations in Farr's policy were not clearly communicated to Farr in writing,[19] Reed promised Farr would be fully covered, and Reed failed to provide such coverage. Thus, Farr contends, the trial court should have granted Farr's motion for partial summary judgment against Reed and denied summary judgment

in favor of Reed on Farr's breach of contract claim. We disagree.

¶ 21 "The elements of a prima facie case for breach of contract are (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages." *Bair v. Axiom Design, LLC,* 2001 UT 20, ¶ 14, 20 P.3d 388. Here, Appellees argued in support of summary judgment that, even assuming a valid contract existed, Reed performed exactly as he agreed by procuring coverage with the same limitations as Farr's existing Trinity policy. Therefore, Reed contends that Farr can show no breach. Because Farr failed to present " 'specific facts showing that there [were] . . . genuine issue[s] for trial' " with respect to this element, *Orvis v. Johnson,* 2008 UT 2, ¶ 18, 177 P.3d 600 (quoting Utah R. Civ. P. 56(e)), we agree that the trial court's grant of summary judgment in favor of Reed was correct.

¶ 22 The undisputed record supports the trial court's conclusion that Reed performed as requested by Dexter Farr. In a letter dated July 14, 2003, Dexter Farr explained that he told Reed he wanted any quotes for new coverage to be based on the limits in his Trinity policy:

> After [Reed] had asked for a copy of the [Trinity] policy for the previous year, I furnished him with the declarations of the various coverages of the policy, but not the detailed pages of the policy; he reviewed each section with me. *This way I could compare apples to apples with the various Insurance Brokers that wanted to cover our company.* He asked questions about various figures to see if I felt it was adequate coverage for these various items. If

---

**18.** Because it was a party to a reinsurance treaty with American States and Safeco, Hartford was the entity that adjusted Farr's claim.

**19.** Relying on several cases, Farr argues that "Utah case law makes it abundantly clear that insurers may not enforce even clearly stated policy coverage exclusions or exceptions when they have not been clearly communicated to the insured in writing." *See Farmers Ins. Exch. v. Call,* 712 P.2d 231 (Utah 1985); *General Motors Acceptance Corp. v. Martinez,* 668 P.2d 498 (Utah 1983); *Marriot v. Pacific Nat'l Life Assurance Co.,* 24 Utah 2d 182, 467 P.2d 981 (1970); *Moore v.*

*Energy Mut. Ins. Co.,* 814 P.2d 1141 (Utah Ct. App.1991). Although we believe that Farr overstates the holdings of these cases, *see generally Allen v. Prudential Prop. & Cas. Ins. Co.,* 839 P.2d 798, 804–05 (Utah 1992) (further explaining its prior holdings in *Call* and *Martinez*), we need not address the issue further. Farr's argument relies on its claim that American States/Safeco *orally* bound coverage under section 31A–21–102(2). Because Farr failed to properly raise its oral binder argument against Appellees in the trial court, we need not address this argument on appeal.

I felt they were out of line, we would adjust them. This happened only on a few items. . . .

(Emphasis added.) In his deposition, Dexter Farr confirmed that his intent was to obtain bids for the same coverage as the Trinity policy:

Q. . . . . [Y]our intent in obtaining bids from various agents and insurance companies, including Andrew Reed and Farmers Insurance, was for you to do what you've described here as an apples to apples comparison. Is that right?

A. Correct.

Q. You wanted to look at the same coverages as close as possible between all of the different policies—

A. That's correct.

Q. —and do a cost comparison.

A. Correct.

Indeed, Dexter Farr provided the Trinity policy's terms, including coverage limits, to Reed and other agents so that they could match any new bids to the Trinity policy:

Q. And in doing that, you had provided Andrew Reed with the information from the coverages that existed in the [Trinity] policy—

A. Yes.

Q. —so that he could match those coverages and then give you a cost comparison under a Farmers policy.

A. Correct.

. . . .

Q. But in any event, [the other agents from whom Farr was obtaining bids] all had that information about the coverages that were existing under the [Trinity] policy.

A. That is correct.

¶ 23 The Trinity policy contains a limit of $25,000 for spoilage due to equipment breakdown. Section A(2)(c) of the policy's Equipment Breakdown Coverage section states: "We will also pay for your loss of 'perishable

goods' due to contamination from the release of refrigerant, including but not limited to ammonia." In this respect, Farr's coverage under the new American States/Safeco policy has the same limit as that in its expired Trinity policy. The American States/Safeco policy provides up to $25,000 in coverage due to "loss of 'perishable goods' due to contamination from the release of refrigerant, including but not limited to ammonia." [20]

¶ 24 During his deposition, Dexter Farr also indicated that he and Reed completed a line-by-line review of the existing Trinity limits. Dexter Farr testified that Reed specifically discussed the need to increase the spoilage limits in its new policy:

Q. Did you talk to Mr. Reed about spoilage temperature change?

A. We talked about—and, again, spoilage, as I had mentioned before, was a new terminology that I hadn't seen in insurance policies previously and only had that one experience where that came up. And *we talked about the $25,000, of which I told him that was ample, because I didn't need anymore [sic] to clean up a chemical spill, which ammonia is a chemical. He did mention that it ought to be a little bit higher, or he—and to my recollection, I thought it was either 50 or 75,000 that he said.*

(Emphasis added.) From Dexter Farr's own testimony, it is undisputed that he asked Reed to obtain a policy with the same coverage for spoilage as previously provided in the Trinity policy. That is exactly what Reed did. Even after Reed suggested an increase in that limit, Dexter Farr decided that $25,000 "was ample." Reed followed Dexter Farr's instructions and sought quotes for the same spoilage coverage as provided by the existing Trinity policy.

¶ 25 Farr argues, however, that it is entitled to coverage consistent with its reasonable expectations that all of its significant risks be covered. In response, Appellees

**20.** The TIE/Farmers proposal, which Reed first presented to Farr on May 14, 2003, also included a $25,000 limitation for "Spoilage/Temperature Change," defined as: "Pays for damage to [Farr's] personal property resulting from mechanical breakdown or failure of refrigerating equipment, contamination by refrigerant or power outages beyond [Farr's] control. Optional Higher limits available." As previously mentioned, Farr found the TIE/Farmers policy terms acceptable, but TIE/Farmers declined coverage.

contend that Utah has declined to follow "[t]he doctrine of 'reasonable expectations.'" In *Allen v. Prudential Property & Casualty Insurance Co.*, 839 P.2d 798 (Utah 1992), the supreme court explained:

> The theory [the plaintiff] advances essentially would allow a court to invalidate a clear provision of an insurance contract, even if the insured had not read it, if the finder of fact is convinced that the insurer's agent knew or should have known that the insured had expectations that contradicted the policy's language and that the agent created or helped to create those expectations.... [W]e decline to make such a change in Utah law.

*Id.* at 803–04; *see also Nielsen v. O'Reilly*, 848 P.2d 664, 667–68 (Utah 1992) (discussing *Allen*), *superseded in part on other grounds by* Utah Code Ann. § 31A–22–305(10) (1995). Although not directly on point, we find *Allen* somewhat analogous. Because the written American States/Safeco policy was delivered after the loss, Farr could not have read a "clear provision of [that] contract." *Allen*, 839 P.2d at 804. Nevertheless, the written policy Reed was asked to duplicate, and which was available to Dexter Farr, has an express provision limiting spoilage coverage to $25,000. Dexter Farr admits that he instructed Reed to obtain bids which also contained that spoilage limit. Consequently, Farr's *reasonable* expectations were met as a matter of law to the extent that the undisputed facts show that Reed obtained the exact coverage that Dexter Farr requested. *See Great Am. Ins. Co. v. Woodside Homes Corp.*, 448 F.Supp.2d 1275, 1286 (D.Utah 2006) ("[T]he undisputed facts in this case establish that [the agent] delivered an insurance policy to Woodside that met Woodside's expectations.").

¶ 26 We agree with the trial court that Reed is entitled to summary judgment on the breach of contract claim based on Reed's Commitment.

**2. Negligence**

■■ ¶ 27 Farr further argues that Reed was negligent because he failed "to diligently and professionally investigate and accurately determine the full nature and extent of ... [Farr]'s significant insurable risks, ... coverage that was available to cover such risks, to determine the cost thereof, and to fully advise [Farr] of the same." Again, we disagree.

¶ 28 To establish a claim of negligence, the "plaintiff must establish four essential elements: (1) that the defendant owed the plaintiff a duty, (2) that the defendant breached that duty, (3) that the breach of duty was the proximate cause of the plaintiff's injury, and (4) that the plaintiff in fact suffered injuries or damages."

*Webb v. University of Utah*, 2005 UT 80, ¶ 9, 125 P.3d 906 (quoting *Hunsaker v. State*, 870 P.2d 893, 897 (Utah 1993)).

■ ¶ 29 Thus, to recover under a theory of negligence, Farr must first establish that Reed owed a duty to Farr. *See generally Harris v. Albrecht*, 2004 UT 13, ¶ 9, 86 P.3d 728 (stating that whether an insurance agent owes a duty to an insured "is a matter of law"). Utah law recognizes that

> [a] duty to procure insurance may arise when an agent accepts an application; makes a bare acknowledgment of a contract covering a specific kind of casualty; lulls the other party into believing a contract has been effected through promises; and has taken care of the insured's needs without consultation in the past.[21]

*Id.* ¶ 30. Here, whether or not Reed was required by law to procure insurance under this standard, he did in fact secure coverage for Farr.

¶ 30 However, Farr contends that an agent's duty to obtain insurance goes beyond the mere act of securing a policy. Relying on *Harris v. Albrecht*, 2004 UT 13, 86 P.3d 728, Farr argues that the agent must secure a policy that adequately covers all of the

---

21. Additionally, an agent and an insured may enter into a contract for insurance "when the agent has definite directions from the insured to consummate a final contract; when the scope, subject matter, duration, and other elements can be found by implication; and when the insured gives the agent authority to ascertain some of the essential facts." *Harris v. Albrecht*, 2004 UT 13, ¶ 30, 86 P.3d 728.

insured's risks. We do not interpret *Harris* so broadly.

¶ 31 In *Harris,* the Utah Supreme Court held that the agent had neither a contract with the plaintiff nor an independent duty to procure insurance. *See id.* ¶¶ 30–31. Implicit in its holding are indications that an agent's contractual obligation or duty to procure insurance is limited to either the information the insured provides to the agent or to the information the agent obtains when given express authority to do so. *See id.* ¶¶ 11–16, 28. The court's holding was based, in part, on the fact that the plaintiff did not give the agent enough information: "In order for [the agent] to procure business insurance, . . . . [he] potentially needed to know the value of all furniture and equipment, accounts receivable, and building improvements[, etc.,] . . . . [but he] had none of this information. . . ." *Id.* ¶ 14. The court also relied on the fact that "[the plaintiff] failed to give authority for [the agent] to ascertain some of the essential facts. . . . [The plaintiff] was required to give explicit instructions to [the agent] rather than make a blanket request for insurance." *Id.* ¶ 16. As in *Harris,* Farr's property and liability insurance had to be customized to Farr's specific needs, unlike an auto or residential homeowner's policy. *See id.* ¶ 26. Thus, Dexter Farr could make those business-specific decisions himself, expressly instruct Reed to obtain the information necessary to make those recommendations, or provide the information necessary to allow Reed to tailor a policy to Farr's needs. Dexter Farr chose to make the decision himself based upon his knowledge of Farr's business operations.

¶ 32 Dexter Farr did not explicitly instruct Reed to ensure his inventory was adequately covered for spoilage, but rather he rejected Reed's suggestion that the spoilage limit be increased. Reed had never before written property or liability insurance for Farr and did not have an independent understanding of the company's needs. Likewise, Dexter Farr did not ask Reed to familiarize himself with the business so as to determine appropriate limits for Farr or provide Reed with information from which he could competently make those assessments for Farr. Instead,

Dexter Farr testified that he maintained control of coverage increases because Reed would not be privy to the information that one would need to make that assessment. Dexter Farr explained that the line-by-line review of Reed's insurance proposal was so that he could make such determinations for himself:

Q. "[Reed] asked questions about various figures to see if I felt it was adequate coverage for these various items."

A. Correct.

. . . .

Q. What do you recall about some of the questions Mr. Reed asked you?

A. We would go down each item and review each item to see if we felt that they were correct or not. And I would say, Yes, I think that covers it. Or I would say, No, I think we need to have a little bit more. And we'd discuss that. And generally everybody agrees if it's a little bit higher.

Q. Was it you—the person who was saying the numbers should be higher, or was Mr. Reed also saying the numbers should be higher?

A. No. It would be me. He wouldn't know.

Dexter Farr testified that he reviewed the existing limits so that he could determine whether he wanted any of them changed and then instructed Reed to obtain quotes matching those limits. Dexter Farr did not ask Reed to undertake an independent investigation to ascertain whether the limits were adequate. We agree with the trial court that Reed had no duty to procure insurance for more than Dexter Farr requested or to analyze Farr's comprehensive insurance needs under the facts of this case. *See id.* ¶¶ 11–16, 28.

¶ 33 A federal case from the District of Utah, *Great American Insurance Co. v. Woodside Homes Corp.,* 448 F.Supp.2d 1275 (D.Utah 2006), is informative because the facts are similar to those present here. In that case, Great American filed a declaratory judgment action, seeking a ruling from the federal district court that it had no duty to provide coverage to Woodside in relation to

three state lawsuits against Woodside for defective construction (the State Actions). *See id.* at 1276. Woodside answered, claiming it was entitled to coverage, and if the court determined that it was not insured for the losses associated with the State Actions, its insurance broker, The Buckner Group (Buckner), should be liable for failing to procure adequate coverage. *See id.* As in this case, Woodside's existing coverage was not renewed, and Buckner assisted Woodside in obtaining replacement coverage. *See id.* at 1276–77. With Buckner acting as its go-between, Woodside obtained a general commercial liability policy underwritten by Great American. *See id.* at 1277. When Woodside was named in the State Actions, it tendered the defense to Great American; however, Great American rejected the tenders and denied coverage. *See id.* The federal court granted Great American's motion for summary judgment, holding that the policy did not cover the defense costs or liability incurred in the state actions. *See id.* at 1287.

¶ 34 The *Woodside Homes* court also granted summary judgment in favor of Buckner. The federal court cited the Utah Supreme Court's decision in *Harris* for the proposition that "[t]he failure of an insurance broker to procure coverage that a potential insured represents to a broker as being essential can result in liability against the broker." *Id.* at 1286 (citing *Harris*, 2004 UT 13, ¶¶ 11–13, 86 P.3d 728). Nevertheless, the court concluded that the deposition testimony of Woodside Homes' chief financial officer and vice president provided undisputed evidence that "[Buckner] delivered an insurance policy to Woodside that met Woodside's expectations." *Id.* (quoting deposition testimony that Woodside "got in the policy what [it] and [Buckner] had discussed getting"). The *Woodside Homes* court granted summary judgment in favor of Buckner because it "procured the insurance coverage that Woodside requested." *Id.* at 1287. The same is true in this case.

¶ 35 In the decades that Dexter Farr was responsible for Farr's insurance needs, he never contracted for spoilage coverage of more than $50,000. He admits that he instructed Reed to procure coverage with the same spoilage limit as existed in the prior Trinity policy—$25,000. Indeed, when Reed suggested even a modest increase in that limit, Dexter Farr determined that $25,000 was ample coverage. Based on the undisputed facts of this case, we agree with the trial court that, as a matter of law, Reed was not negligent in his dealings with Farr.

3. Covenant of Good Faith and Fair Dealing

■■ ¶ 36 Farr next challenges the trial court's grant of summary judgment on its claim for breach of the covenant of good faith and fair dealing. "Under Utah law, 'an implied covenant of good faith and fair dealing generally inheres [in] all contractual relationships.'" *Prince v. Bear River Mut. Ins. Co.*, 2002 UT 68, ¶ 27, 56 P.3d 524 (alteration in original) (quoting *Rawson v. Conover*, 2001 UT 24, ¶ 44, 20 P.3d 876). "Under this covenant, the contracting parties each impliedly promise not to intentionally or purposely do anything [that] will destroy or injure the other party's right to receive the fruits of the contract, and to . . . act consistently with the agreed common purpose and the justified expectations of the other party." *Id.* (alteration in original) (citations and internal quotation marks omitted).

■■ ¶ 37 For the same reasons previously discussed in this opinion, Farr's arguments regarding bad faith also fail. Reed obtained the policy that Farr requested, which contained a $25,000 coverage limit similar to the one in Farr's prior Trinity policy. Because Reed did precisely what Dexter Farr asked him to do, he cannot be held liable for breaching the covenant of good faith and fair dealing as a matter of law. *See id.* ("[T]o comply [with the covenant], a party must act consistently 'with the agreed common purpose and the justified expectations of the other party.'" (second alteration in original) (citation omitted) (quoting *Rawson*, 2001 UT 24, ¶ 44, 20 P.3d 876)); *see also Craner v. Northwestern Mut. Life Ins. Co.*, 12 F.Supp.2d 1234, 1242 & n. 4 (D.Utah 1998) ("[W]here there is no breach of an express covenant in a contract, there can be no cause of action for breach of an implied covenant arising therefrom.").

**B. Kirchen, Central Bonds, and Auto–Owners**

**1. Breach of Contract**

¶ 38 In its third amended complaint, Farr alleges that Kirchen and Central Bonds materially breached "the affirmative obligations owed by them to [Farr] under and in connection with Reed's Commitment." Because we affirm the trial court's summary judgment in favor of Reed on the alleged commitment made to Farr, we likewise affirm the trial court's ruling as to these defendants. The testimony of Dexter Farr, the only Farr representative who dealt directly with Reed prior to the loss, establishes that Reed performed as instructed by procuring insurance bids that matched the coverage provided in Farr's prior policy with Trinity. Because Farr has failed to come forward with any evidence that could support a finding that Reed breached the purported commitment, Central Bonds and Kirchen, as well as Auto–Owners, can have no liability arising out of that commitment, even if Reed were acting as their agent-an issue we need not address. *See generally Holmstead v. Abbott G.M. Diesel, Inc.,* 27 Utah 2d 109, 493 P.2d 625, 627 (1972) ("[A]bsent any delict of the master other than through the servant, the exoneration of the servant removes the foundation upon which to impute negligence to the master."), *abrogated on other grounds by Krukiewicz v. Draper,* 725 P.2d 1349, 1352 (Utah 1986) (holding common law rule replaced by statute).

 ¶ 39 We also agree with the trial court that Farr has failed to establish any evidence that could support a claim against these defendants for the breach of an alleged coverage agreement.[22] At Reed's request, Kirchen used the Central Bonds computer to generate pricing information for an Auto–Owners policy to insure Farr's property and liability risks. There is no dispute that Auto–Owners' regional underwriter expressly stated that coverage "was subject to receiving ... home office approval." While the process of obtaining approval from Travelers

and Auto–Owners was ongoing, the expiration of Farr's existing policy with Trinity was fast approaching.

¶ 40 On May 13, 2003, one day before the expiration of the Trinity policy, Farr received quotes for its property and liability insurance from Auto–Owners and several other underwriters. Although it was made conditional upon home office approval, Dexter Farr selected the Auto–Owners quote and delivered a check payable to Auto–Owners to Reed. Several days later, Auto–Owners' home office declined coverage and Kirchen returned the uncashed check. Even Dexter Farr admitted that he "knew [on May 23] that Auto–Owners ... was not extending coverage." Based on the undisputed facts, we agree that there was a failure of a condition precedent and therefore the trial court was correct in concluding that no contract was formed between Farr and Auto–Owners, Farr and Kirchen, or Farr and Central Bonds. *See generally McBride–Williams v. Huard,* 2004 UT 21, ¶ 13, 94 P.3d 175 (" 'Condition precedent' is defined as an act or event, other than a lapse of time, *that must exist or occur* before a duty to perform something promised arises." (emphasis added) (additional internal quotation marks omitted)); *see, e.g., Bilanzich v. Lonetti,* 2007 UT 26, ¶ 11 n. 4, 160 P.3d 1041 (noting that, under the facts of that case, "the failure of the condition precedent invalidated the entire [contract]").

**2. Negligence**

 ¶ 41 Neither Kirchen, Central Bonds, nor Auto–Owners had any direct contact with Farr. Consequently, no special relationship could exist that would impose a duty on them. *See Harris v. Albrecht,* 2004 UT 13, ¶ 30, 86 P.3d 728. Therefore, we also affirm the trial court's summary judgment in favor of these defendants on Farr's negligence claim.

**3. Estoppel**

¶ 42 Farr argues that Kirchen told Reed that they were in the "binder period" and asserts that this obligated Central Bonds,

---

**22.** To the extent this claim is based on an allegation of oral binder, we do not address it for the reasons set forth in Part I of this decision.

Auto–Owners, or both to provide coverage at a level sufficient to cover Farr's losses. Therefore, Farr challenges the grant of summary judgment on its estoppel claim. Farr does not argue, however, that there was a written binder of insurance coverage issued by Central Bonds or Auto–Owners; he instead asserts that Kirchen, Central Bonds, and Auto–Owners provided an "oral contract of insurance" on May 14, 2003.[23] As discussed, the trial court properly refused to consider Farr's oral binder claims asserted for the first time after three years of discovery in response to Appellees' motions for summary judgment. Therefore, we do not address this argument on appeal.[24]

### 4. Bad Faith Adjustment of Insurance Claim

¶ 43 On appeal, Farr asserts claims against Kirchen, Central Bonds, and Auto–Owners for breach of contract, negligence, and bad faith for the actions taken in connection with the investigation, settlement, and payment of Farr's insurance claim made after the loss. *See generally Prince v. Bear River Mut. Ins. Co.*, 2002 UT 68, ¶¶ 27–29, 56 P.3d 524 ("In the first-party insurance context, th[e] implied covenant of good faith performance contemplates, at the very least, that the insurer will diligently investigate the facts to enable it to determine whether a claim is valid, will fairly evaluate the claim, and will thereafter act promptly and reasonably in rejecting or settling the claim." (internal quotation marks omitted)). Because there is no evidence of any written binder of insurance for coverage between Kirchen, Central Bonds, or Auto–Owners and Farr, the trial court was correct in granting summary judgment for these Appellees on Farr's bad faith adjustment claim.

### C. Safeco, Hartford, Trustco, and American States

### 1. Agency

¶ 44 Farr alleges that Safeco, Hartford, Trustco, and American States, as principals of Reed, are equally liable based on Reed's Commitment. Because we have held that Reed did not breach any contract or tort obligations to Farr based on this alleged commitment, none of these parties could be liable under an agency theory for breach of that purported commitment. *See generally Holmstead v. Abbott G.M. Diesel, Inc.*, 27 Utah 2d 109, 493 P.2d 625, 627 (1972), *abrogated on other grounds by Krukiewicz v. Draper*, 725 P.2d 1349, 1352 (Utah 1986). Therefore, we need not address whether, in fact, an agency relationship exists between Reed and any of these defendants.[25]

### 2. Breach of Contract and Negligence

¶ 45 After Auto–Owners declined coverage, Kirchen approached Granger at Trustco to ascertain whether he would be interested in presenting the American States/Safeco quote previously submitted to Farr by Blackburn–Jones.[26] Granger promptly obtained a BOR letter from Farr so that he could represent American States/Safeco on the resubmission of the Blackburn–Jones quote. Because Farr had been without coverage for nine days, Reed instructed Granger to obtain coverage that day. On the assumption that the prior Blackburn–Jones quote with American

---

**23.** In its third amended complaint, Farr concedes that "the Primary Defendants [failed] to issue [Farr] a written binder."

**24.** We also note that both in its brief and at oral argument, Farr has failed to direct us to, and we have not located, any place in the record where Dexter Farr states that Reed informed him that Auto–Owners had "bound coverage." In fact, Dexter Farr admitted that he "knew [on May 23] that Auto–Owners ... was not extending coverage." And there is no indication in the record that Dexter Farr was aware that either Kirchen or Central Bonds even existed. For example, Reed testified that he did not have any discussion with Dexter Farr about Auto–Owners' involvement when Dexter Farr picked up the premium check.

**25.** Farr also argues on appeal that "Trustco and Safeco ratified Reed's acts" and are thus fully liable to Farr for its loss. Because we do not need to decide whether an agency relationship exists between Reed and Trustco or Reed and American States/Safeco, we likewise need not address Farr's ratification argument.

**26.** The Blackburn–Jones quote was presented orally to Dexter Farr in response to his request for bids that he could compare, apples-to-apples, with the existing Trinity policy.

States/Safeco was complete, Granger did so, writing in his personal notes: "I asked [American States/Safeco's underwriter] about coverage being bound & she said it was. I told her to go with all coverages except auto as they had gone to Farmers w/auto." Farr admits that no written binder of insurance coverage was ever issued by Safeco, American States, Hartford, or Trustco.

¶ 46 All of Farr's objections to the summary judgment in favor of Safeco, Hartford, Trustco, and American States are dependent on its argument, raised for the first time during the summary judgment briefing, that these defendants orally bound insurance coverage for Farr that provided coverage for all of Farr's reasonable insurance needs. For the reasons discussed in Part I of this opinion, these claims are not properly before us, and we do not consider them.

### CONCLUSION

¶ 47 For the reasons set forth in this opinion, we affirm the trial court's denial of Farr's motion for summary judgment and grant of summary judgment in favor of Appellees.[27]

¶ 48 WE CONCUR: WILLIAM A. THORNE JR., Associate Presiding Judge and JAMES Z. DAVIS, Judge.

---

27. Because we affirm the trial court's summary judgment ruling, we need not address the issues that Appellees Trinity and Unitrin raise on appeal regarding joinder and apportionment of fault.